THE STATE, Respondent, v. NORTH & SCOTT, Appellants.*

1. No state has power, under the constitution of the United States, in the exercise of its taxing power, to discriminate in favor of its own manufactures and productions and against those of its sister states. Such a discriminating tax, whether levied on the goods and manufactures of sister states in the original unbroken bale or package in which they are brought into the state, or upon the same after they have become incorporated into the mass of property of the state, would be unconstitutional and void.

2. As a state can not, by a direct tax on the manufactures and productions of sister states, discriminate against them, so it can not accomplish such a result indirectly by requiring a merchant dealing in such manufactures to take out a license and pay a tax thereon, while it levies no such tax upon merchants dealing in articles of its own manufacture and growth.

3. The act to tax and license merchants, approved December 11, 1855 (R. C. 1855, p. 1072), so far as the same required merchants dealing in the manufactures of sister states to take out licenses from the state authorities and to pay a tax on the same, is unconstitutional and void. (NAPTON, Judge, dissenting.)

4. A state law requiring an importer of foreign goods, who sells the same in the original unbroken package, to take out a license from the state authorities and to pay a tax on the same, would be unconstitutional.

5. The provision of the constitution of the state of Missouri which declares that all property subject to taxation shall be taxed in proportion to its value does not require that all the property in the state shall be taxed, but that when any species of property is selected for taxation it shall be taxed in proportion to its value.

*Appeal from St. Louis Criminal Court.*

The following is the indictment in this case : " The grand jurors of the state of Missouri within and for the body of the county of St. Louis, now here in court, duly empannelled, sworn and charged, upon their oath, present that William North and William P. Scott—they being a partnership under

* The opinions of the judges in the above case are also applicable to the case of the State v. Doan and others, decided at the present term of the supreme court. The said case of the State v. Doan and others involved the same questions decided in the above case of The State v. North & Scott, and in the case of The State v. Shapleigh, reported ante, p. 344; also the further question of the right, under the act to tax and license merchants, to sell, without a license, *in broken packages*, goods the manufacture of sister states.—[REP.

the name and style of North & Scott, late of St. Louis, in St. Louis county—on the first day of July, in the year of our Lord, 1856, and on divers other days between that day and the day of the finding of this indictment, at St. Louis, in St. Louis county as aforesaid, unlawfully did deal as a merchant, in the selling of goods, wares and merchandise not the growth, manufacture and produce of this state, and not unmanufactured articles the growth and produce of other states, by then and on said other days and times there selling as a merchant as aforesaid one thousand pairs of patent leather boots," &c., &c., " the same being goods, wares and merchandise, at a place then and on said other days and times occupied by William North and William P. Scott—they being a partnership of persons under the name and style aforesaid—for that purpose, to divers persons to the grand jurors aforesaid unknown, for the sum and price of six dollars for each and every pair of boots, pair of gaiters, and pair of shoes sold as aforesaid, without then and on said other days and times having a license therefor continuing in force ; against," &c.

To this indictment the defendant demurred. The court overruled the demurrer. The cause was submitted to the court on the following agreed statement of the facts : " It is admitted by defendants that during the time covered by this indictment the defendants, as copartners, as charged, were doing business as merchants, and that they did deal in the selling of goods, wares and merchandise at a store occupied by them for that purpose at the county aforesaid, without a license therefor, and that in their dealing as merchants aforesaid they did sell manufactured articles which were of the growth and produce of the state of Massachusetts and other states of this Union, and were imported by them into this state and sold by them in the original packages as imported, of the description as charged in the indictment." This was all the evidence in the cause. The defendants asked the court to declare the law as follows : " If the defendants neither received for sale nor sold at their store in St. Louis any other goods except such as were imported into this state

from other states of the Union by defendants and sold by them in the original unbroken packages, as imported, then the defendants are not guilty and the court will so find." The court refused so to declare, but declared the law to be as follows: " If defendants were copartners in business as merchants, and during the time covered by the indictment did, at St. Louis county, deal in the selling of goods, wares and merchandise, as described in the indictment, which were articles manufactured in other sister states of this Union and the growth and produce of such states, and thence imported by defendants into this state and sold in the original unbroken packages, at a store occupied by them for that purpose, without a license authorizing them so to deal, they are guilty as charged in the indictment." The court found the defendants guilty.

*Shepley*, *Gamble* and *Hannegan*, for appellants.*

I. The judgment in the case of the State v. Shapleigh and others can not be sustained. The act of December 11, 1855, to tax and license merchants is, in design and effect, a tax upon property and not a license to pursue a particular avocation or calling. The merchant licensed pays according to the amount of property he has. The tax is not equal upon all. In the case of Nathan v. State of Louisiana, 8 How. 73, all engaged in the calling of broker or banker were taxed equally, regardless of the amount or kind of business. There was no attempt to tax a specific property under the guise of licensing an occupation. In the present case, some persons are exempt who receive for sale only a certain kind of property. The act professes to tax all merchants, but in reality imposes the tax for the licenses only upon those merchants who deal in foreign commodities and in manufactured articles, the products of other states. The tax is not a fixed amount to be paid by all in that business; it is not to be paid

* The three cases, State v. Shapleigh, State v. North & Scott, and State v. Doan and others, were argued and submitted at the same time to the supreme court.

by *all men* in that kind of business. It is not to be estimated on the amount of profits, nor by the amount of sales, but is simply a tax imposed upon particular kinds of property according to its value. If the legislature is prohibited from laying a direct tax upon any species of property, it can not effect the same object by requiring the person selling the article to pay a tax by way of license proportional to the amount he receives of the article. (See Brown v. Maryland, 12 Wheat. 419.) A person importing goods into this state from foreign countries, paying to the United States duties thereon and selling them only in the original unbroken packages, is protected by the constitution of the United States from being compelled to pay a tax thereon, or take out a license for the selling of the same. (Brown v. Maryland, 12 Wheat. 419.) The authority of the case of Brown v. Maryland has not been shaken by any subsequent decision. With the exception of Mr. Justice Daniel, none of the judges of the supreme court of the United States have expressed views antagonistic to the principles decided in that case, so far as it related to foreign commerce. The taxing of imports, while they remain in their original state as articles of commerce, is repugnant to the clause of the constitution relating to commerce, and also to that clause which declares that the states shall not lay imposts or duties on imports or exports. The power to regulate commerce is exclusively vested in Congress. The only question is, when does the power of Congress over the import cease ?

II. A person importing goods into this state from sister states of this Union, and only selling and holding them in their original unbroken packages, is protected by the constitution of the United States from being compelled to take out a license for the selling the same or pay tax thereon. The decision in Brown v. Maryland, though the case only related to foreign importations, went to the full extent of holding that the traffic between the states was equally protected. None of the judges, except Mr. Justice Thompson, expressed any dissent from the reasoning or conclusions of the Chief

Justice. (See 2 Story on Const. 512, 516.) The power of Congress over the subject is exclusive. If exclusive only when Congress has acted upon the subject, then Congress has acted by willing that inter-state commerce should be free. It has in various ways regulated in reference to inter-state commerce. It has passed laws in relation to the transfer, enrollment, licensing and inspection of boats; the removal of obstructions in rivers that do not have any outlet to tide-waters; in the erection of light-houses on Lake Michigan; improvement of inland harbors on the rivers and upon Lake Michigan. So also the act in question is unconstitutional in that it conflicts with that provision of the constitution of the United States which provides that "all duties, imports and excises shall be uniform throughout the United States." So also it is repugnant to the constitution in that it is an attempt to regulate foreign and domestic commerce by making a discrimination in favor of home productions and against products of other states and imported goods, with a view of raising a revenue from the latter. The law is also in conflict with that provision of the state constitution which provides that "all property subject to taxation in the state shall be taxed in proportion to its value." (See Gibbons v. Ogden, 9 Wheat. 509; License Cases, 5 How. 504; Passenger Cases, 7 How. 283; State v. Price, 13 N. H. 578.)

*Mauro*, (circuit attorney,) for the State.

I. The act to tax and license merchants is constitutional. It is not a regulation of commerce, though some of its provisions may have a remote bearing and influence upon commerce. It does not prevent, nor does it seek to prevent, the importation of any kind of goods whatever, nor does it impose any conditions upon, or place any impediment in the way of, a free interchange of commodities with other states and countries. It simply imposes a tax by way of license upon the avocation of selling imported goods after the offices of commerce are accomplished, the goods are released from the grasp of the federal government, and they have obtained

a lodgment in this state and are fully under the protection of its laws. It is a revenue law. Conceding that it is a regulation of commerce, it is not therefore void. The states may regulate commerce so long as Congress does not intervene. (7 Pet. 251; 11 Pet. 102; License Cases, 5 How. 504; Passenger Cases, 7 How. 283.) The act does not impose a tax on property. It does impose a tax upon an avocation, and none the less so because the amount to be paid upon each license is graduated according to the amount of business done under it. (Nathan v. Louisiana, 8 How. 73; 5 How. 588.) A tax upon a vocation is not a duty upon imports within the meaning of the constitution of the United States. The case of Brown v. Maryland is distinguishable from the present. Under the Maryland act one sale was sufficient; it was immaterial whether the goods sold were upon ship board, in bond at the custom-house, or elsewhere. Under our act there must be a " dealing in the selling" at a store, &c., occupied for that purpose. The articles sold by the defendants had lost their distinctive character as imports. (See License Cases, 5 How. 504; Passenger Cases, 7 How. 283.) They had become confused with the common mass of property in the state. After their introduction the state may tax them. The law is not in violation of the nineteenth section of the bill of rights of this state. If it is a tax upon property, which is denied, it is an *ad valorem* tax.

Scott, Judge, delivered the opinion of the court.

The defendants, who composed a copartnership, were indicted, under the second section of the act entitled " An act to tax and license merchants" (R. C. 1855, p. 1073), for dealing as merchants without a license. On the trial, it appeared that the defendants carried on business as merchants; that they sold manufactured articles which were of the growth and produce of the state of Massachusetts and other states of the Union, and were imported by them into this state and sold in the original packages as imported. The

court declared the law to be, that if the defendants were copartners in business as merchants, and, during the time covered by the indictment, did, at St. Louis county, deal in the selling of goods, wares and merchandise as described in the indictment, which were articles manufactured in other sister states of this Union, and the growth and produce of such states, and then imported by defendants into this state and sold in the original unbroken packages, at a store occupied by them for that purpose, without a license authorizing them so to deal, they are guilty as charged in the indictment. The following instruction asked by the defendants was refused: "That if the defendants neither received for sale nor sold at their store in St. Louis any other goods, except such as were imported into this state from other states of the Union by defendants and sold by them in the original unbroken packages as imported, then the defendants are not guilty, and the court will so find."

The first section of the act to which reference has been made defines a merchant to be a person, or copartnership of persons, who shall deal in the selling of goods, wares and merchandise at any store, stand or place occupied for that purpose. The second section of the same act imposes a fine of not less than fifty nor more than five hundred dollars upon every person or copartnership of persons who shall deal as a merchant without a license first obtained. The third section of the act provides that merchants "shall pay an *ad valorem* tax, equal to that which is levied upon real estate, upon all goods, wares and merchandise purchased by them, except such as may be the growth, produce or manufacture of this state, and except such manufactured articles as may be the growth or produce of other states." By the subsequent provisions of the act, a license is obtained by giving bond for the payment, on the first of November, of all taxes which may then be due for the twelve months ending on the first November upon the merchant's license as a vendor of goods, wares and merchandise. And it was made the duty of every licensed merchant, on the first day of November of

each year, to file in the office of the clerk of the court granting the license a statement of the amount of all goods, wares and merchandise (excepting such as may be the growth, produce or manufacture of this state, and except such unmanufactured articles as may be the growth or produce of other states) received for sale within the year then ending.

From the foregoing statement of the law and facts of this case, it will be seen that it presents the question of the power of the states, in the exercise of the right of taxation, to discriminate between products of this state and those manufactured in our sister states. It will be seen that the discrimination is made, whatever guise it may assume, or by whatever name it may be called. It clearly appears from the statute that it exempts from tax or license the merchant who deals in goods the growth or produce of this state, while those who deal in the like goods of other states are compelled to take out a license, which can only be obtained by paying an *ad valorem* tax on all the goods received for sale. And can a more important question arise affecting the peace of the states—one that more deeply concerns the harmony and good understanding towards each other which should pervade the several states composing this Union? Happily for the people of the United States they have a government that was organized in an enlightened age, when there lived men whose wisdom and intelligence were sufficient, and whose patriotism prompted them, to set forth the causes which led to its adoption. The papers and resolves, that had their origin in a desire to amend the articles of confederation, shed a great light to guide us in the interpretation of the powers of that government by which the old confederacy was replaced. The motives to the formation of the federal government were not only blessings in anticipation, but an anxiety to be delivered from evils wide-spread in their operation and threatening to deprive us of all the advantages derived from the toils and sacrifices of the revolution had a large share in promoting that great design. Some of the greatest of these evils had their source in the powers with which the states were sepa-

rately clothed of laying duties on imports and of regulating commerce; powers which, though the constitution considers as substantive and distinct, yet in their exercise frequently run into each other and mingle together. The extent to which the power to regulate commerce may be exercised can not be fully defined by prospective laws. It is a power whose exercise depends on contingencies which can not be foreseen. Motive agents not yet conceived may ultimately come into use, which may cause a necessity for the exertion of this power. It was said in the case of Gibbons v. Ogden, 9 Wheat. 1, that, as the words " to regulate" imply in their nature full power over the thing to be regulated, it excludes necessarily the action of all others that would perform the same operation on the same thing. That regulation is designed for the entire result, applying to those parts which remain as they were as well as to those which are altered. It produces a uniform whole, which is as much disturbed and deranged by changing what the regulating power designed to leave untouched as that on which it has operated. But though the enactments of Congress for the regulation of commerce are supreme, and those regulations, whether they are express or arise by necessary implication, are equally binding, and supersede state regulation, yet it is conceived that the states, in the exercise of the power of regulating their own internal affairs—whether in enacting police laws, laws for the preservation of the health of their citizens, or laws for the improvement of their navigable streams—may, in an enlarged sense of the phrase, be said to exercise the power of regulating commerce; and such regulation will be constitutional, unless it interferes with provisions enacted by Congress in pursuance to the federal constitution. In this sense are understood those who maintain that the power to regulate commerce is concurrent between Congress and the states; that the power, in all its branches and ramifications, is not so exclusively vested by the constitution in Congress as that all state legislation, which may fall within the range of the power of regulating commerce, will be unconstitu-

tional, though not in conflict with any act of Congress. It would be a bold proposition that the states of this Union have a concurrent power, in the regulation of commerce, with the Congress of the United States, in all matters but those in which there is an express prohibition on them by the constitution. The power to regulate commerce with foreign nations and among the several states and with the Indian tribes having been conferred by the constitution on Congress, and the power to lay and collect duties and imposts being vested in the same body, with an express prohibition on the states, without the consent of Congress, from laying any imposts or duties on imports or exports except what may be absolutely necessary for their inspection laws, it is conceived that the history of the time during which the confederation of the United States of America existed, the form of government supplanted by the present constitution, will show that the law, whose validity is the subject of consideration, is in conflict with the spirit and meaning of the federal constitution.

A want of power to raise revenue for its support was not the only defect in the old confederation of the states as a system of government. The articles of confederation left the power of regulating commerce in the states, except the restriction contained in the sixth article, which was a limited and temporary one. The want of a single and united body to regulate commerce was sensibly felt and caused loud complaints against the government. The state of Virginia, which was always active in proposing and eager in accepting means offered for the alteration of the articles of confederation so as to endow them with greater energy and power, on the 30th November, 1785, resolved, " that the relative situation of the United States has been found on trial to require uniformity in their commercial regulations as the only effectual policy for obtaining in the ports of foreign nations a stipulation of privileges reciprocal to those enjoyed by the subjects of such nations in the ports of the United States, for preventing animosities which can not fail to arise among the several states

from the interference of partial and separate regulations; and whereas such uniformity can be best concerted and carried into effect by the federal councils, which, having been instituted for the purpose of managing the interests of the states in cases which can not be so well provided for by measures individually pursued, ought to be invested with authority in this case, as being within the reason and policy of their institution." These are the sentiments of a body of men, whose acts had an immediate agency in bringing about the measures that led to the adoption of the present federal constitution.

The "Federalist," after declaring that one of the principal purposes to be answered by the Union is the regulation of commerce with other nations and between the states, maintains that "a unity of commercial as well as political interests can only result from a unity of government; that the competitions of commerce would be fruitful sources of contention. The states less favorably circumstanced would be desirous of escaping from the disadvantages of local situation and of sharing in the advantages of their more fortunate neighbors. Each state, or separate confederacy, would pursue a system of commercial polity peculiar to itself. This would occasion distinctions, preferences and exclusions, which would beget discontent. The habits of intercourse, to which we have been accustomed from the earliest settlement of the country, would give a keener edge to those causes of discontent than they would naturally have independent of this circumstance. We should be ready to denominate injuries those things which were in reality the justifiable acts of independent sovereignties consulting a distinct interest. The spirit of enterprise which characterizes the commercial part of America left no occasion of improving itself unimproved. It is not at all probable that this unbridled spirit would pay much respect to those regulations of trade by which particular states might endeavor to secure exclusive benefits to their own citizens. The infraction of these regulations on the one side, the efforts to prevent and repel them on the other,

would naturally lead to outrages, and these to reprisals and wars."

Judge Marshall, who lived under the confederation and was an historian of the events of that time, says: "The oppressed and degraded state of commerce previous to the adoption of the constitution can scarcely be forgotten. It was regulated by foreign nations with a single view to their own interests, and our disunited efforts to counteract their restrictions were rendered impotent by want of combination. Congress, indeed, possessed the power of making treaties, but the inability of the federal government to enforce them became so apparent as to render that power, in a great degree, useless. Those who felt the injury arising from this state of things, and those who were capable of estimating the influence of commerce on the prosperity of nations, perceived the necessity of giving the control over this important subject to a single government. It may be doubted whether any of the evils proceeding from the feebleness of the federal government contributed more to that great revolution which introduced the present system than the deep and general conviction that commerce ought to be regulated by Congress." (12 Wheat. 446.)

These citations, coming from the sources they do, should be sufficient to satisfy us that the necessity for the regulation of commerce and the laying of imposts and duties by a single government were great and moving causes in the formation of the federal constitution, and that experience showed that the exercise of these powers could not be confided to the several states without causing rivalries, restrictions and exclusions, which would finally end in the termination of their union.

It has been observed that the law under review involved the exercise of the power by the state to discriminate in taxation between articles the manufacture of this state and those the manufacture of other states, and it may be added of foreign nations. As commerce may be regulated in many ways, it will not be denied that one of the methods of exercising

this power is the imposition of discriminating taxes or duties on articles the manufacture of other states or nations. During the existence of the confederacy, and at the time of the adoption of the federal constitution, the states do not seem to have turned their attention to the protection of domestic manufactures. The population being agricultural and commercial, its wealth was mostly derived from the sale and exchange of its products with other nations. Hence we do not find any complaints in relation to the imposing of discriminating taxes or duties, except so far as they may have been laid to counteract the policy of those states which, having a sea-board, would tax the imports or exports of other states, which, having no ports of their own, were obliged to export and import through the territory of the states more favorably situated for commerce. But, whatever may be the motive for the tax, whether revenue, restriction, retaliation, or protection of domestic manufactures, it is equally a regulation of commerce, and in effect an exercise of the power of laying duties on imports; and its exercise by the states is entirely at war with the spirit of the constitution, and would render vain and nugatory the power granted to Congress in relation to those subjects. Can any power more destructive to the union and harmony of the states be exercised than that of imposing discriminating taxes or duties on imports from other states? Whatever may be the motive for such taxes, they can not fail to beget irritation and to lead to retaliation; and it is not difficult to foresee that an indulgence in such a course of legislation must inflame and produce a state of feeling that would seek its gratification in any measures regardless of the consequences. We all remember that some years ago, when it was proposed in our councils to lay a discriminating tax on the products of some of our sister states, that the measure had its origin in a feeling of hostility engendered by a course of conduct on their part conceived to be inimical to the policy of this state. Fortunately, the measure proposed was not adopted; and however much we may sympathize in the opposition to the conduct complained

of, we can not but express our satisfaction that our legislative records were not made to bear any such law.

But it is when considered in reference to our foreign commerce that this power in the states seems most destructive to one of the important ends proposed by the adoption of the federal constitution. After the treaty of 1783, foreign nations would not contract treaties of commerce and navigation with the United States. As there was no power to regulate commerce in the central government, they did not think it worth while to enter into obligations with a nation which had no legislative control over the subjects about which they would treat, and whose treaties might be frustrated by any member of the confederacy. Great Britain refused to negotiate with us on account of the weakness of our government and its want of authority to regulate commerce. Now that the power to regulate commerce has been delegated by the states, and the power of laying duties on imports taken away from them, can it be maintained that there is still an authority to lay a tax which shall discriminate between the products of the citizens of the states and the like products of foreign nations? What nation would treat with the general government, if the advantages secured to it by a treaty with that government were at the will of the several states composing the Union? If a foreign nation, for a fair equivalent, should obtain from the federal government the right to import its products free of duty, how would that government justify itself in the eyes of the world if the states composing the Union should single out the imports from that nation and subject them to a tax which would prevent a sale of them?

Under a power to levy a discriminating tax between domestic and foreign products, commerce may not only be regulated, but indirectly a duty may be laid on imports. In laying a tax discriminating against the imports from foreign nations or the sister states, a duty is as effectually laid as though the tax had been demanded before the importation was allowed. What is the difference between collecting the tax before the import is admitted and singling it out from all.

31—VOL. XXVII.

others after it has been admitted and subjecting it to the same tax?

It is maintained that the supreme court of the United States, in the case of Brown v. The State of Maryland, 12 Wheat. 448, decides that, although the states can not tax imports while they are in the original bales or boxes in which they were imported, yet, when the boxes are broken up and the imported goods become incorporated into the mass of the property of the state, those goods become subject to taxation like all other property in the state. This is not denied. We do not conceive that the opinion, which denies to the states the power to lay discriminating taxes on the products of other states or of foreign nations, at all abridges or impairs the power in the states to lay and collect taxes. While it is admitted that all the property in the state subject to private ownership is liable to taxation, it is no diminution of this power so to limit its exercise as to prevent a discriminating tax between similar articles. The abolishment of the discriminating tax will be the means of increasing the revenue; as, if the tax on all the property is made equal to the discrimination, or if the property exempt by way of discrimination is made subject to taxes, the revenue will be increased. Can a restraint on the abuse of a power fairly be said to be a limitation of that power? Is it a diminution of the power of taxation to hold that the general assembly can not require that the property of the left-handed only shall pay all the revenue of the state; or that men born in a particular state shall bear all the taxes? Is it an abridgment of the power of raising revenue to maintain that a law can not be passed which imposes a tax on an article made in Boston, while a similar article made in Charleston is exempted? that a cloth manufactured in England shall pay a tax, while similar cloth made in France shall be free from taxation? Although the states may not be bound to find purchasers for goods imported into them, yet it is insisted that they can not so abuse the power of taxation as to drive an imported article from the market by an unfair and unequal discrimina-

ting tax. There is no difference in principle between laying a duty before an article is imported and the imposing a discriminating tax, which, after its importation and incorporation into the mass of the property of the state, prevents its sale. That which can not be done directly can not be done indirectly. (Brown v. State of Maryland, 12 Whea. 448-9.)

But it is said that the passage of the law under consideration is nothing more than the exercise of the power of laying taxes, a power unquestionably belonging to the states; and that its enactment was conceived in no design to regulate commerce with foreign nations or among the several states. It is true, in the law before us there is no discrimination against particular states or nations. It is against all states and nations. But, a power to discriminate against all carries with it a power of discrimination as to individuals. If the general power is sanctioned, it is not easy to perceive the principle by which it can be arrested in its more limited exercise. If a law actually violates the constitution, its nullity must be declared, notwithstanding there may have been no intent in the makers of the law to violate that instrument. The constitutionality of a law can not depend upon the motives of its makers. The uprightness of the intention of the lawgiver in the enactment of a law may excuse him in a moral point of view, but it can add nothing to its constitutional validity. When the state of Maryland imposed a tax on a branch of the Bank of the United States situated within her jurisdiction, the law could not escape the objections of its want of conformity to the constitution by the argument that taxation did not necessarily and unavoidably destroy. It was answered, that the power to tax involves the power to destroy; that the power to destroy may defeat and render useless the power to create; that the exercise of such a power was inconsistent with the right of the government to use the means employed; and that they were not driven to the perplexing inquiry, so unfit for the judicial department, what degree of taxation is the legitimate use, and what degree may amount to the abuse of power? (4 Whea. 430-1.)

In Brown v. The State of Maryland, 12 Wheat. 439, it was said that "it is obvious that the same power which imposes a light duty can impose a very heavy one which amounts to a prohibition. Questions of power do not depend on the degree to which it may be exercised. If it may be exercised at all, it must be exercised at the will of those in whose hands it is placed. The question is, where does the power reside; not, how far it will be probably abused; and the greater or less extent in which it may be exercised does not enter into the inquiry concerning its existence. When we are inquiring whether a particular act is within this prohibition, the question is, not whether the state may so legislate as to hurt itself, but whether the act is within the words and mischief of the prohibitory clause."

We do not conceive that this case involves the right of the state to tax professions, occupations or trades. Such a power in the states has been sanctioned in the case of Nathan v. The State of Louisiana, 8 How. 73. The same right was recognized in the case of Brown v. Maryland, 12 Wheat. 439; yet its recognition did not prevent the court from declaring a state law to be unconstitutional which required all importers of foreign goods by the bale or package to take out a license on which a tax was levied. So here, the question is not whether a license to do business may be taxed, but whether, under color of a license, a tax may be imposed which is not warranted by the constitution. If the tax is unconstitutional, the form by which it may be attempted to be collected is a matter of no importance. Can a state lay a discriminating tax on goods after their importation? If it can not do it directly, then the same thing can not be accomplished by any indirect means. The requiring of every dealer in goods which have been imported to take out a license, on which a tax is levied, is the same thing as imposing the tax on the goods themselves.

From the view we have taken of this subject, it will be seen that it is not deemed a matter of any importance whether the power of laying a discriminating tax is exercised

on the original package or bale in which the merchandise was imported, or whether it is exercised on the goods themselves after they have been incorporated into the mass of the property of the state. It is obvious that if the laying of a discriminating tax is unconstitutional, the time at which the power is exerted, or the condition of the goods at the time of its exercise, can not change the nature of the act.

We have not been enabled to ascertain that the question before us has ever received a direct determination. In the case of Biddle v. The Commonwealth, 13 S. & R. 405, the law required every person dealing in the selling of any goods, wares, or merchandise, wines or distilled liquors—except such as were of the growth, produce or manufacture of the United States—to take out a license for vending such goods, for which license certain duties were to be paid. There was also an exception in favor of importers who sold in the original cask, case, box or package, in which the goods were imported. The court held this law to be constitutional. But in the opinion nothing is said in relation to the question of the power of the states to lay a discriminating tax against foreign merchandise. In the case of Pierce v. The State of New Hampshire, 13 N. H. 582, Judge Parker said : " Should an attempt be made by a state to prohibit the sale of imported iron, or salt, or sugar, or cotton goods, within its limits, or to tax articles the produce of another state beyond the rate of similar articles produced within its own borders, it would very readily be seen that such legislation was not a regulation of internal police merely, but that its design and effect, if admitted, must be the regulation of foreign commerce or commerce among the states also." In the case of the People v. Huntingdon, 4 N. Y. Leg. Obs. 197, Judge Smith concurs in opinion with Judge Parker, and adds : " Under whatever name or pretence such a law might be passed, it must be regarded as a fraudulent attempt to override the constitution, and hence could not be sustained." In the case of Brown v. The State of Maryland, 12 Wheat. 439, it was held that a law was unconstitutional which required all

importers of foreign goods by the bale or package to take out a license on which a tax was imposed. It was held that such a law violated the provision of the constitution which prohibited the states from laying imposts and *duties on imports* or exports, and also that which declares that Congress shall have power to regulate commerce with foreign nations among the several states and with the Indian tribes. Judge Marshall, after an able opinion against the constitutional validity of such a law, remarked: " In conclusion, *it may* be proper to add that we suppose the principles laid down in this case to apply equally to importations from a sister state. We do not mean to give any opinion on a tax discriminating between foreign and domestic articles." We do not consider that the " license cases," as they are termed, reported in 5 How. 504, as deciding any thing in hostility to the views we have expressed. Those cases stand on a ground entirely different from those on which our opinion rests.

The foregoing intimations of opinion on this question will be sufficient, we trust, to defend us from the imputation of introducing any novelty into our constitutional law. We have not sought this task ; it has been forced upon us, and we have entered upon its discharge with a due sense of the responsibility under which we labor. If we have erred, we feel confident that we have erred on the side of safety and in a desire to cherish peace and good-will among the states of the Union. We do not conceive that the opinion that we entertain in the least injuriously affects the power of taxation of the state. On the contrary, by requiring the same tax to be levied on like articles produced or manufactured in this state, we rather increase the revenue. Nothing is to be gained by the exercise of the power of laying a discriminating tax. If it is lawful for one state to do it, it is equally so to the others. Laws will be passed in retaliation of those we may enact, and so we may be losers in the end. Situated as the state of Missouri is, she should be one of the last to enter on such a course of legislation. Without a sea-board, far in the interior, cut off from all outlets to foreign com-

merce, she would be one of the greatest sufferers in a contest of such a nature. If we have erred in applying to the law under consideration the principle that a tax discriminating between foreign and domestic articles can not be imposed, we feel confident, nevertheless, that the principle is a correct one. No one can rise from reading the history of the events out of which our present constitution had its existence, without a conviction that the power of laying a discriminating tax on the importations from other states and nations was never designed to be left with the several states. That is a power only to be exercised by a single body, and that body has been created with ample power for the protection of the interests of all the states.

The 19th section of the bill of rights, which declares that all property subject to taxation in this state shall be taxed in proportion to its value, has been repeatedly construed by this court to mean, not that all the property in the state must be taxed, but that when any article of property is selected for taxation, it shall be taxed in proportion to its value and not specifically; and the general assembly may therefore not only levy an *ad valorem* tax on the goods of merchants, but may also impose a tax on their occupation, to be collected in the form of license.

On the facts as agreed, the defendants should have been acquitted; and the judgment will be reversed and the defendants discharged from their recognizance; Judge Richardson concurring; Judge Napton dissenting.

NAPTON, Judge, dissenting. By the constitution of the United States, it is declared that "the powers not delegated to the United States by the constitution, nor prohibited by it to the states, are reserved to the states, or to the people." A power to tax all the persons and property and occupations within the limits of a state, is a necessary incident to state sovereignty; and if that power has been abandoned or restricted, the abandonment or restriction must be found clearly expressed, or necessarily implied, in the provisions of the

federal constitution. The prohibition ought to be plain or the implication necessary, since it is not to be presumed that the states would permit doubtful or refined construction to deprive them of so essential an element of existence.

No subject was more thoroughly discussed, none better understood or more generally agreed upon in the convention of 1787, than the propriety and necessity, conceded on all sides, of vesting the federal government with such powers as would effectually put a stop to the conflicting commercial regulations in the different seaboard states, which had produced a vast deal of complaint, a great amount of inconvenience, and probably real hardship upon the states in the interior or without harbors, and which, in truth, was one of the principal and immediate incentives to the meeting at Annapolis, which preceded the more general convention in Philadelphia. We learn from Mr. Madison's papers, as well as from the resolutions of several of the states, that this subject was the only ostensible avowed purpose which it was proposed to accomplish, although it was well understood that other changes in the old articles of confederation, vastly more important, were contemplated. Under these circumstances it would seem strange that the work of the convention, the constitution of the United States, should still leave it a debatable question to what extent it was designed to limit the taxing power of the states, and how far the taxing power of the two governments was designed to be concurrent over the same subject, and where it was intended to be exclusive in the one or the other. The result of their deliberations and actions is before us. The convention undoubtedly supposed they had accomplished every purpose deemed important or desirable on this subject by two provisions inserted in the constitution. One is a prohibition to the states from laying any imposts or duties upon imports or exports without the consent of Congress. The other provision invested Congress with the power to " regulate commerce with foreign nations, and among the several states." Beyond this the convention did not deem it necessary to go to secure the objects in view.

It is now contended and decided that the states can not levy a tax upon merchandise brought from foreign countries, or from other states, after it has become the property of their citizens, and after it has paid duties (if any were due) to the federal government, and it has passed from the hands of the importer and been distributed among retailers, or the original packages in which it was imported have been broken up, unless the same tax is levied on similar productions or similar articles of manufacture raised or made within the state where the tax is levied. Where is the provision of the constitution which imposes this restriction ? The proposition is, that the power to regulate commerce with foreign nations and among the several states excludes all exercise of such power by the states, whether the ground be occupied by federal legislation or not. Be it so. This is not my opinion, nor was it the opinion of a majority of the supreme court of the United States, who decided the License Cases reported in 5 Howard. C. J. Taney, with Judges Nelson, Woodbury, Daniel and Catron, were of opinion that every object proposed to be accomplished, and which ought to be accomplished consistent with a due maintenance of state sovereignty and state safety, was obtained by construing this provision to yield a supremacy to federal legislation, and not to exclude necessarily all state legislation on the subject. The Chief Justice did not hesitate to express his alarm at the consequences of any other construction, and avowed his belief that it would "seriously impair the powers of taxation which have been heretofore exercised by the states." But let it be conceded that the power is exclusive. The question still presents itself after this concession is made, whether a tax upon foreign merchandise in the hands of retail dealers within this state, or of wholesale dealers (after the package is broken), is a regulation of commerce with foreign nations, or between the states, within the meaning of this provision of the federal constitution. Such a tax, it is admitted, imposes a burden on commerce to some extent ; but because it imposes directly a burden on commerce, is it therefore a regulation

of commerce with foreign nations or between the states? If the answer to this question is affirmative, and such I understand is the conclusion to which a majority of the court has arrived, let us see to what results it leads. I can follow it to no other conclusion than that the legislature have no power to tax merchants or merchandise at all. How will you tax merchants without imposing a burden upon commerce? What law can be devised to effect such a purpose as this? Merchants are the persons by whom all the commerce of the country is conducted. They are the agents who exchange the surplus productions and manufactures of this state for those of foreign nations and sister states. Every tax upon the merchant, however small, whether exacted in the shape of a license or imposed in the form of an *ad valorem* duty, is a burden upon commerce; and if the legislature of Missouri have no power to impose a burden on commerce, they have no power to tax merchants or their effects.

A power to tax, said Judge Marshall, is a power to destroy. If taxes, then, upon merchandise or merchants are regulations of commerce within the meaning of the clause of the constitution referred to, the power to levy them carries with it a power to destroy commerce with foreign countries and between the states, and is totally prohibited *to the state governments*, as much as the power to tax the branch of the United States Bank was prohibited to the state of Maryland in the case from which Judge Marshall's sentiment has been quoted. But the proposition is, that the legislature may impose this burden upon commerce—may tax merchants and their importations from abroad, provided they will also levy a tax upon all similar articles manufactured in this state; or, if the tax is extended (as it formerly was) to foreign produce, it will be valid, provided similar productions of this state are also taxed to the same amount. In other words, if a tax is laid upon articles of foreign growth or manufacture in the hands of a retail merchant of Missouri, the same rate of taxation must be imposed upon similar articles of domes-

tic production or manufacture in the hands of the same merchant.

How the burden on commerce is to be diminished by this extended taxation, I do not see; but I do see the enormous injustice of the proposition. The effect is to throw the main burden of taxation upon the home manufacturer and agriculturist. As the law now stands, the farmer pays taxes upon his capital, upon his lands, his slaves, his cattle, horses, &c. The manufacturer does the same; he pays the taxes which this law now imposes upon all his property, all his manufacturing capital, whether houses, machinery, tools, &c. The proceeds of this capital, in the case of the farmer, are his hemp, tobacco, wheat, corn, &c. They are the income which, under the present law, is not taxed. The proceeds or income of the capital of the manufacturer are the manufactured articles now proposed to be taxed. True, the tax is to be levied in the shape of a merchant's license, and is to be paid by the merchant first. But upon whom does the burden fall at last? Will the commission merchant take the tobacco, wheat and hemp of the farmer, pay the tax on it which is levied on foreign hemp, wheat and tobacco, and not charge it to the farmer along with his commission when a settlement is made? Will not the merchant who sells by retail or wholesale the rope, glass, hardware, stoves, &c., consigned to him by the manufacturer, or sold to him as articles of merchandise, deduct from his sales and commission, or from the price he has absolutely given, the amount of the tax which he knows must be paid by him upon these articles as merchandise? Of course, the tax must come out of the farmer or manufacturer. The farmer then must become his own merchant, must take his tobacco to Liverpool, his hemp to Kentucky or New York, his wheat to whatever foreign market promises the best price, or he must submit to a tax upon his *income* in addition to that he now pays on his *capital*. The manufacturer must take his bale rope and bagging to a cotton-growing region; his glass, nails, castings, &c., to whatever market abroad may be the best, or pay a

tax through the merchant upon his entire income also. *The merchant pays no such tax.* His capital only is taxed and not his income. Nor is an income tax levied on any other industrial class of the community. It will be seen at once that if the merchant who acts as a broker to dispose of the tobacco, wheat and corn of the farmer, or the bale-rope, nails, or white lead of the manufacturer, or who purchases these productions and manufactures as merchandise with a view to resale, is compelled to pay a tax on their value equal to the tax levied on similar articles imported from abroad, the weight of this taxation falls on the farmer and manufacturer and not on the merchant, and the farmer and manufacturer have to bear a burden of taxation not imposed upon any other pursuits. In short, their property is taxed twice, substantially ; first, in the shape of capital, and secondly, in the proceeds or income of that capital. This is what I call discrimination—discrimination against the farmer and domestic manufacturer, and in favor of the productions and manufactures of other countries. As the law now stands, there is no discrimination of which any class of our citizens has a right to complain. The merchant does not pay taxes upon the manufactures of this state, simply because they have already borne their proper burden of taxation in the hands of the manufacturer.

But let us see how this discrimination or exemption of domestic productions affects commerce with foreign countries, or between the states. That it may indirectly affect such commerce is admitted, and so must every tax upon the merchant and upon his merchandise. But this does not make it unconstitutional, or we must cut off from the states all power of taxing articles imported from abroad. The primary object or effect of the law must be to regulate commerce, and not the mere incidental or remote effect which no revenue law can entirely avoid. It must reach the interests mainly of foreign countries or sister states, and not be confined in its operations to the interests and prosperity and internal commerce of this state. How does the law now in

question concern any government or people under the sun except those of Missouri ?   Leaving out of view the fact that Missouri productions are not taxed, and that thus far there is exemption or discrimination, all the world is put upon a footing so far as their intercourse with us is concerned. There is no discrimination in the amount of taxation, and none in reference to the place of production.  Whether brought from the West Indies or East Indies, from Charleston or Boston, the tax is the same.   No tax is levied on sugar made in Cuba which is not levied on sugar made in Louisiana.   The law is wholly *infra territorial*, affecting the citizens of Missouri alone—reaching the public coffers of Missouri alone—touching the internal commerce of this state alone, excepting always that incidental and necessary tendency which every tax for revenue levied upon merchants has upon all commerce, both foreign and domestic.   To tax a steamboat or the owner of a steamboat for the value of his boat is a tax upon commerce remotely, incidentally and necessarily.   Can not the state of Missouri tax steamboats owned by her citizens, because they are vehicles of commerce and because such a tax necessarily imposes an indirect or even direct burden upon commerce ?   Yet, if the power to regulate commerce is totally denied to the states and exclusively vested in Congress, and every tax which reaches the interests of commerce and has a tendency to diminish or restrict it, either with foreign nations or between the states, is such a regulation of commerce as has been confided exclusively to the federal government, steamboats can not be taxed, merchants can not be taxed, and the limits of state taxation are exceedingly narrow.   It is difficult to see how the states can tax any business whose range extends beyond her territorial limits, or any pursuit which is based upon an exchange of foreign for domestic productions.

Previous to the formation of the federal constitution and whilst the states were bound together by the articles of confederation, each state had its own custom-house and its own tariff.   There was no uniformity, and some of the states, as

Mr. Madison informs us, taxed imports from others. Connecticut taxed imports from Massachusetts. Now, no state can tax imports or exports; no state has custom-houses or tariffs.

If the present revenue law is a tax upon imports or exports, I admit it is unconstitutional. That part of the act which taxes goods in the hands of the importer before the original package is broken, has already been passed upon, and, in conformity to the decision in the case of Brown v. Maryland, has been declared void. My opinion about the case of Brown v. Maryland has already been fully stated in the case of Crow and others v. The State, decided several years ago; and I shall not here repeat what was said there. Although the reasoning and judgment in that case is not in conformity to my views, yet I cheerfully submitted to abide by it, and to leave it to some future review of the same tribunal which decided it to be reaffirmed or overruled. I observe that the supreme court of Georgia have, in a recent case, totally repudiated the doctrine of Brown v. Maryland; and in 1825, before the case of Brown v. Maryland was decided, the supreme court of Pennsalvania, with Tilghman as chief justice, came to a conclusion, on the same question, just the opposite to that reached by the supreme court of the United States. (Riddle v. The Commonwealth, 13 S. & R. ——.) The case of Raguet v. Wade, 4 Ohio, 407, is also hard to be reconciled with the case of Brown v. Maryland.

But let the case of Brown v. Maryland stand. That decision does not touch the question of discrimination. It admits the power of a state to tax imports, just as she has power to tax any other property of her citizens, after they cease to be under the protection which their character as imports gives them. And when is this point reached? After the goods have left the hands of the importer, or been broken up in their original package. When this point has been passed the case of Brown v. Maryland concedes the full power of state taxation, and this concession determines the present question. If importations from abroad, so soon as they have

passed from the custom-house and been broken up in the possession of the importing merchant, or passed out of his hands into the possession of the retail dealer, are upon a footing with all other property owned by other citizens within the state, then they may be taxed or be exempted from taxation as the state chooses; for, in relation to all property which does not come from abroad, it is admitted that the state may discriminate. It is admitted that the state may tax slaves and omit to tax land; that the state may tax four year old cattle and exempt all under that age from taxation; that horses may be taxed and mules be left untaxed. How then can property brought from other states or from foreign countries occupy the same position with property raised or made here in reference to the taxing power of the state, unless the power of discrimination, selection or exemption exists in both cases? The thing is impossible. Either this imported property from abroad does not occupy the same ground with property which always was here, although it has paid duties and passed the point which Judge Marshall fixed as the terminus of the federal power, or it does. The supreme court, in Brown v. Maryland, declared that it did occupy the same ground; and if that be so, then the power of state taxation is not affected by any provision of the federal constitution, but depends altogether on the state constitution. By the latter instrument it is admitted that the power of discrimination is not taken away. Therefore the power of discrimination exists as well in reference to property which comes from abroad as it does in reference to that which is of domestic origin. But if importations from abroad do not cease to be imports within the meaning of the constitution of the United States after they have paid duties, and after they have passed into the hands of retailers, and after they have, as Judge Marshall expressed it, been mixed up with the other property of the state, when do they lose this character? Do they retain it always? Judge Marshall, it is true, said an import was a thing imported; but he saw there was a point when things imported fell as completely within the tax-

ing power of the states as though they had never possessed the character of imports. He admitted his general reasoning was subject to limitations ; that it would be a fatal blow upon the states to deprive them of the taxing power over property which came from abroad, merely because it was from abroad. Hence he assigned a limit, and that limit has been passed in this case, and the property, although imported, has ceased to be an import, but occupies precisely the same ground with any other property belonging to citizens of Missouri, and found within her territorial limits.

If a farmer of Missouri imports thorough-bred cattle from Kentucky, do not these cattle fall within the taxing power of this state just as well as the cattle owned by the same farmer raised here ? If so, have not the legislature the same power to tax or to omit to tax them, or the same power to tax them and omit to tax the home-bred cattle, which they are conceded to have in reference to every other species of property liable to taxation ? How is the case altered by supposing that the cattle are imported by a trader, whom the legislature may, if they chose, call a merchant ? May they not require a license ? And is not the license an indirect tax upon Kentucky raised cattle ? And does it not affect commerce in cattle with that state ? Is not a tax upon horses and an exemption of mules from taxation a discrimination in favor of mules ? Yet the legislature may pass such laws. With their expediency I have no concern. It is the question of power of which alone I speak. What I maintain is, that the property of the merchant, after it ceases to be protected as imports, is just in the same situation in reference to state taxation in which all the other property of the citizens of the state is ; and this power is important to the preservation of the peace, welfare, health and morals of the citizens of the states, and may be safely entrusted to their legislatures. The constitution of the United States was based upon the supposition that the same amount of intelligence, discretion and patriotism was to be expected in the state government that was likely to be found in the federal government; that lim-

itations or checks were essential to each; but that abuses of power under either must necessarily be left to those motives of self-preservation, patriotism, and a regard for the public welfare, which would be likely to have as much practical operation among the constituents of the one as of the other.

It will be seen that the opinion, which maintains the concurrence of the power over commerce in the federal and state governments, affords an ample check against abuses of the power by the latter. The supremacy of the laws of Congress, when such laws are deemed necessary to abolish or prevent injudicious state legislation interfering with commerce with foreign nations or between the states, is admitted. In the present case the law is denied to be a regulation of commerce, and if it was admitted to have that effect, it would not therefore be invalid.

It may happen that property will be introduced into this state which is believed to be destructive of the health or morals of our citizens, or dangerous to the stability of our institutions. Have the legislature no power to prevent or to discourage the diffusion of such property by an increased rate of taxation, by licenses at high prices, or by such penalties upon its sale as would amount to a total prohibition of its circulation? Yet, if the states have this power, its exercise will, to some extent, impair commerce, and, where the tax amounts to prohibition, will destroy it. The concession of such a power can not be made to consist with a denial of the power to discriminate by calling it a police power. The motive which prompts the passage of a law can not make it constitutional. The motive may be excellent, but if a state lacks the power, the law is invalid. The motive may be bad, yet, if the state possesses the power, the law is valid. It is a question of power. The word police has no magic in it; it means simply the internal government of a state. A revenue law is a police law, as much so as a law to promote health or protect public morals. Neither the one or the other is valid, if the state has no power to pass it; and no step in advance is made by determining the law to be beneficial to health or

32—VOL. XXVII.

morals. That is a question of expediency of which the legislature are to judge.

In a word, it will be understood that, in my humble opinion, the law now under consideration is not a regulation of commerce with foreign nations, or between the states; that it was not so intended, and has no such results; that, to make it such, every law, which imposes a burden on commerce or has a tendency to diminish foreign importations, must be held a regulation of commerce within the meaning of the federal constitution; that this doctrine annuls all taxation whatever upon merchants; that merchandise ceases to be imports, within the meaning of the prohibition in the constitution, when the duty to the federal government has been paid and the package is broken up in the hands of the importer or has passed to the retail merchant; that no other limit has been fixed by judicial decision; that if the merchandise which is thus mingled with the mass of other property is not liable to taxation because an import, then no tax can ever be levied upon importations; that there is no provision in the federal or state constitutions which prohibits such discrimination or exemption as is found in this law, and no decision of the supreme court of the United States or of any state court which has so declared it. I believe also that such laws are to be found in the statute books of many states, perhaps all; and certainly it has always been the law here. I therefore conclude with the words of Judge Woodbury from the bench of the supreme court of the United States, " it is perfectly competent for the states to assess a higher tax or excise by way of license or direct assessment on articles of foreign rather than domestic growth belonging to her citizens; and it has ever been done, however it may discourage the use of the former or lessen the revenue which might otherwise be derived from them by the federal government, or tend to reduce imports as well as to restrict the sale of them."