THIS case came up from the Superior Court in and for New Castle County at the late November term of that Court, on a case stated, as if found by a special verdict of a jury for the opinion of the court, upon the question of law therein stated and reserved and directed to be *Page 159 
heard in the Court of Errors and Appeals, and which was heard before all the Judges in this Court. The case stated was as follows:
1. The Plaintiff is the Treasurer of the State of Delaware.
2. The Defendant, the Philadelphia, Wilmington and Baltimore Railroad Company, was formed in the year 1838 by the union and consolidation of the Baltimore and Port Deposit Railroad Company of Maryland, the Philadelphia, Wilmington and Baltimore Railroad Company of Pennsylvania, and the Wilmington and Susquehanna Railroad Company of Delaware and Maryland; the last-named company having been formed in the year 1836 by the union and consolidation of the Wilmington and Susquehanna Railroad Company of the State of Delaware, and the Delaware and Maryland Railroad Company of the State of Maryland.
The original Wilmington and Susquehanna Railroad Company of Delaware was incorporated under and in pursuance of an act of the General Assembly of the State of Delaware, entitled "An Act to incorporate the Wilmington and Susquehanna Railroad Company," passed on the eighteenth day of January, 1832, and possessed all the franchises, rights and privileges by the said act, and the several supplements thereto conferred; among others, that of constructing, maintaining and operating a railroad extending from the Pennsylvania State Line to the City of Wilmington, and thence to the line of the State of Delaware towards the Susquehanna River, in the direction of the City of Baltimore in the State of Maryland.
The Delaware and Maryland Railroad Company was incorporated under and in pursuance of the provisions of an act of the General Assembly of the State of Maryland, passed at their December Session, 1831, entitled "An Act to incorporate the Delaware and Maryland Railroad Company," and possessed all the franchises, rights and privileges by the said act and the several supplements *Page 160 
thereto conferred; among others, that of constructing, maintaining and operating a railroad extending from a point on the Delaware and Maryland line, through the town of Elkton, to some point on the Susquehanna River.
The said Wilmington and Susquehanna and Delaware and Maryland Railroad Companies were united and consolidated into a corporation known as The Wilmington and Susquehanna Railroad Company, by authority of an act of the General Assembly of the State of Delaware, entitled "A further supplement to an act entitled `An Act to incorporate the Wilmington and Susquehanna Railroad Company'," passed the 24th day of July, A. D. 1835, and of an act of the General Assembly of the State of Maryland, passed at their December Session, A. D. 1835, entitled "A further supplement to the act entitled `An Act to incorporate the Delaware and Maryland Railroad Company'," and in pursuance of certain "Articles of Union," adopted, certified and recorded as directed by law, a copy of which certificate is hereto annexed, marked Exhibit A.
The Baltimore and Port Deposit Railroad Company was incorporated under and in pursuance of the provisions of an act of the General Assembly of the State of Maryland, passed at their December Session, A. D. 1831, entitled "An Act to incorporate the Baltimore and Port Deposit Railroad Company," and possessed all the franchises, rights and privileges by the said act and the several supplements thereto conferred; among others, that of constructing, maintaining and operating a railroad from the City of Baltimore, in the State of Maryland, to Port Deposit in the same State.
The Philadelphia, Wilmington and Baltimore Railroad Company of Pennsylvania, was originally incorporated as "The Philadelphia and Delaware County Railroad Company," under and in pursuance of an act of the General Assembly of the Commonwealth of Pennsylvania, approved the 2d day of April, A. D. 1831, entitled *Page 161 
"An Act authorizing the Governor to incorporate the Philadelphia and Delaware County and Southwark Railroad Companies," and possessed all the franchises, rights and privileges by the said acts and the several supplements thereto conferred; among others, that of constructing, maintaining and operating a railroad from the City of Philadelphia to the boundary line of the State of Delaware. The name of the said company was changed to that of the Philadelphia, Wilmington and Baltimore Railroad Company by a supplement to the act of incorporation, approved the 14th day of March, 1836.
The union of the consolidated Wilmington and Susquehanna Railroad Company, the Baltimore and Port Deposit Railroad Company, and the Philadelphia, Wilmington and Baltimore Railroad Company, of Pennsylvania, was effected by the execution of certain "Articles of Union," (a copy of which is hereto annexed, marked Exhibit B), by the said three companies, on the 5th day of February, 1838, under the authority and in pursuance of the Acts of Assembly therein recited.
Before the last mentioned union, by which the present Philadelphia, Wilmington and Baltimore Railroad Company was formed, the Baltimore and Port Deposit Railroad Company had constructed a railroad extending from Baltimore to the west bank of the Susquehanna River; the consolidated Wilmington and Susquehanna Railroad Company had constructed a railroad extending from the east bank of the Susquehanna River to the City of Wilmington, and the original "Philadelphia. Wilmington and Baltimore Railroad Company" of Pennsylvania, had, under and in pursuance of a transfer by the Wilmington and Susquehanna Railroad Company, made in accordance with the second section of an act of the General Assembly of the State of Delaware, passed on the 13th day of January 1837, entitled "A further supplement to an act entitled `An Act to incorporate the Wilmington and Susquehanna Railroad Company'," of its rights and. privileges in the premises, constructed that *Page 162 
portion of the railroad originally intended to have been constructed by the Wilmington and Susquehanna Railroad Company, which extended from the City of Wilmington to the divisional line between the States of Delaware and Pennsylvania, and had, under the power conferred by its own charter, constructed a railroad from the said divisional line to a point within the now corporate limits of the City of Philadelphia.
The railroads constructed by the said three companies formed a continuous line, extending from a point at or near the City of Philadelphia in the State of Pennsylvania, through the State of Delaware, to Baltimore in the State of Maryland, excepting the interval between the eastern terminus of the railroad of the Baltimore and Port Deposit Railroad Company, on the west bank of the Susquehanna River, and the western terminus of the railroad of the Wilmington and Susquehanna Company, on the east bank of the said river, between which termini communication was maintained by means of a ferry boat belonging to the two companies owning the railroads terminating at the river.
Since the consolidation of the said three companies, the Philadelphia, Wilmington and Baltimore Railroad Company has been, and was on the 11th day of August, 1864, engaged in the business of transporting passengers by steam power on the said line of railroad, which, by the completion of a railroad bridge across the Susquehanna river, in the year 1866, was rendered a continuous line, extending without break or interval, from the City of Philadelphia in the State of Pennsylvania, through the State of Delaware, to the City of Baltimore in the State of Maryland. The said line of railroad forms part of a great line of travel and transportation between the northern and southern States of the Union. The capital invested in its maintenance and operation by the present consolidated company has been largely increased since the formation of the said company, being now represented by 186,088 shares of capital stock of the par value of fifty dollars per share. *Page 163 
The said company is, and was on the 11th day of August, 1864, also engaged in the transportation of passengers by steam power on a line of railroad operated, but not owned by it, of which it is the lessee, connecting with its aforesaid main line of road at New Castle Junction in the State of Delaware, and thence extending southwardly to the southern boundary of the State of Delaware, and there connecting with the Eastern Shore Railroad, extending to Crisfield, in the State of Maryland.
On the 11th day of August, 1864, the General Assembly of the State of Delaware passed an act entitled "An act to raise revenue for this State," a copy of which is hereto annexed.
Between the 1st day of November, 1868, and the 1st day of November, 1869, the said corporation, defendant, transported by steam power on the railroads aforesaid, in a continuous course of transportation, either through the State of Delaware, between points beyond the limits of that State, or between a point beyond and a point within the limits of that State, or between a point within and a point beyond the limits of that State, ___________ passengers, as follows:

 In the month of November, 1868,
 " " " December, "
 " " " January, 1869,
 " " " February, "
 " " " March, "
 " " " April, "
 " " " May, "
 " " " June, "
 " " " July, "
 " " " August, "
 " " " September, "
 " " " October, "

Of which number ___________ were transported exclusively on the main line of railroad extending as aforesaid from Philadelphia to Baltimore.
Under the provisions of the said act of August 11, 1864, *Page 164 
the said company would be liable, at the rate of ten cents per passenger, to a tax of $_______ assuming that the act is applicable to the entire number of passengers thus as aforesaid transported, and to a tax of $________ assuming that the said act is inapplicable to the passengers thus as aforesaid transported on the main line of railroad extending from Philadelphia to Baltimore.
The corporation defendant has hitherto refused and still refuses to pay the said sum or any portion to the plaintiff, or to any other officer or agent of the State of Delaware, alleging that the aforesaid act of August 11, 1864, so far as the same is applicable to the whole number of passengers carried as aforesaid, is in conflict with the Constitution of the United States, and especially with the provision thereof which gives to Congress the power to regulate commerce with foreign nations and among the several States, and with the right of transit free from State taxation between the several States, which, under the said Constitution, is a privilege of citizens of the United States; and so far as the said act is applicable to the passengers transported on the main line of railroad extending from Philadelphia to Baltimore aforesaid, is in conflict with the clause in the Constitution of the United States which forbids any State passing a law impairing the obligation of a contract.
If the Court shall be of opinion that the plaintiff is entitled to recover the tax for the whole number of passengers above mentioned, then judgment shall be entered in his favor for the sum of $________, but if the Court shall be of opinion that the plaintiff is entitled to recover the tax for all except those transported on the aforesaid main line of railroad extending from Philadelphia to Baltimore, then judgment shall be entered in his favor for the sum of $______; but if the Court shall be of opinion that the plaintiff is not entitled to recover the said tax for any of the passengers aforesaid, then judgment shall be entered for the defendant, either party to have the right to remove the record to the Court of Errors and Appeals of this *Page 165 
State, and to sue out a writ of error from the Supreme Court of the United States to the said Court of Errors and Appeals. It is further agreed that either party may refer, in the argument of the case, to any act of the legislatures of Delaware, Maryland or Pennsylvania, relating to any of the four railroad companies now represented by the Philadelphia, Wilmington and Baltimore Railroad Company, or to the said last mentioned company itself, and that any and all acts of Assembly thus referred to shall be considered as and form part of this case stated, also the original articles of union, (copies of which are hereto annexed).
Witness our hands this second day of December, A. D. 1869.
 CHARLES B. LORE, Att'y Gen'l. For the T. F. BAYARD, Plaintiff. ELI SAULSBURY, GEORGE C. GORDON, For the Defendant.
And now, December 2d, A. D. 1869, the foregoing case stated having been read and filed, it is considered by the Court that the questions of law therein contained ought to be decided before all the Judges; it is therefore, on the joint application of the parties to this suit, ordered by the Court, and they do hereby direct that the same shall be heard in the Court of Errors and Appeals at the next term thereof.
 E. W. GILPIN, C. J. EDWARD WOOTTEN, J. JOHN W. HOUSTON, J.
Articles of Union of the Wilmington and Susquehanna and the Delaware and Maryland Railroad Companies.
These presents certify to the Recorder of Deeds of New Castle county that at a meeting of the stockholders for the Wilmington and Susquehanna Railroad Company and of *Page 166 
the Delaware and Maryland Railroad Company, held pursuant to due and legal notice in that behalf given, at the office of the Wilmington and Susquehanna Railroad Company, in the city of Wilmington, on the eighteenth day of April, in the year of our Lord eighteen hundred and thirty-six, the holders of a major part in amount of the stock of each of the said companies attending in person or by proxy at that time and place, did decide that the said railroad companies should be united and together form one body politic and corporate by the name, style and title of "The Wilmington and Susquehanna Railroad Company" upon the following terms and stipulations, deemed by them proper and expedient:
First. — There shall be fifteen directors to manage the business and affairs of the corporation, who shall be elected by the stockholders at this present meeting, and at each annual meeting hereafter, and they shall elect, by ballot, one of their number as president of the company within three days after each annual election of directors.
Second. — The annual meetings of the company shall be held in the city of Wilmington on the second Monday of January, in each and every year hereafter; and the officers elected at this meeting shall hold their offices till the first annual meeting hereafter, and until their successors be duly chosen.
Third. — All officers and agents of the said company, other than the directors, shall be elected or appointed by a majority of the directors.
Fourth. — All by-laws shall be passed, made and altered or repealed by a majority consisting of not less than two-thirds of the directors;Provided, That no by-laws shall contravene any of these terms and stipulations; and the by-laws of the Wilmington and Susquehanna Railroad Company shall be the by-laws of this company until altered or repealed by two-thirds of the directors, as aforesaid.
Fifth. — All rules and regulations necessary and proper for the management and conduct of the business and affairs *Page 167 
of the company, not provided for in a by-law, may be made by the directors, and the business and affairs of the company shall be conducted and managed by them; and five directors shall constitute a quorum for the transaction of business.
Sixth. — All the existing stockholders in either of the said companies hereby united, shall be and become henceforth stockholders in this company, and the corporate seal of the Wilmington and Susquehanna Railroad Company shall be and be used as the corporate seal of this company until otherwise provided by a by-law; and certificates shall be issued to the stockholders for their respective shares in the capital stock of this company upon the surrender of their respective certificates for the same number of shares of stock in either of the companies hereby united.
In testimony whereof we, William Seal, chairman, and Edward W. Gilpin, Secretary of the said meeting, have hereunto subscribed our names this eighteenth day of April, eighteen hundred and thirty-six.
 WILLIAM SEAL, Chairman. Attest: E. W. GILPIN, Secretary.
Articles of Union of the Philadelphia, Wilmington and Baltimore, the Wilmington and Susquehanna, and the Baltimore and Port Deposit Railroad Company.
Articles of union made and concluded this fifth day of February, in the year of our Lord one thousand eight hundred and thirty-eight, between the Wilmington and Susquehanna Railroad Company, the Baltimore and Port Deposit Railroad Company, and the Philadelphia, Wilmington and Baltimore Railroad Company, by virtue and in pursuance of an act of the General Assembly of the State of Delaware, entitled "A further supplement to an act entitled `An act to incorporate the Wilmington and Susquehanna Railroad Company'," and an act of the General Assembly of Maryland entitled "An act to authorize the union of the Baltimore and Port Deposit Railroad *Page 168 
Company, the Wilmington and Susquehanna Railroad Company, and the Philadelphia, Wilmington and Baltimore Railroad Company," and of an act of the General Assembly of Pennsylvania entitled "An act supplementary to the act incorporating the Philadelphia, Wilmington and Baltimore Railroad Company."
First. — The said three corporations are hereby united, and from and after the first election of directors hereinafter provided for in the third article, shall be merged into one body corporate under the name and style of "The Philadelphia, Wilmington and Baltimore Railroad Company," and the stocks of the said three corporations so united shall form one common stock, and all the estate, real, personal and mixed, and the rights, privileges, advantages and immunities belonging to each of the said corporations, become and be vested in the said body corporate, and the debts and liabilities of each of the said corporations shall be deemed and are hereby declared to be the debts and liabilities of the said body corporate.
Second. — The stock of the said body corporate is hereby divided into shares of fifty dollars each, of which the present stockholders of the Wilmington and Susquehanna Railroad Company are hereby declared to be entitled in all to sixteen thousand shares; the present stockholders of the Baltimore and Port Deposit Railroad Company to nineteen thousand shares; the present stockholders of the Philadelphia, Wilmington and Baltimore Railroad Company to ten thousand shares, including those forfeited heretofore, which are to be held for the use of this corporation, and certificates of stock as may be regulated by the president and directors of the said body corporate shall be granted and issued accordingly to each of the said stockholders so soon as the said stockholders shall have paid up all instalments due upon the shares of stock held by them respectively, and shall have surrendered the certificates previously issued to them as stockholders in the respective companies hereby united; and the capital stock of the said corporation shall consist of such number of *Page 169 
shares as aforesaid, subject to the right and privilege of increasing the same from time to time, according to the provisions of the respective charters of the said companies hereby united.
Third. — There shall be fifteen directors to manage the affairs and business of the said body corporate, and a meeting of the stockholders of the three corporations hereby united for the election of the first directors shall be held at Wilmington on Wednesday the fourteenth day of February instant, of the time and place of which meeting notice shall be given by the present president of the Wilmington and Susquehanna Railroad Company, by advertisement in at least three newspapers, at which meeting fifteen directors shall be elected by the said stockholders voting in person or by proxy, and each share being entitled to one vote. And the directors so elected shall hold their offices until the ensuing annual meeting of the stockholders and until their successors are elected.
Fourth. — The stated meetings of the stockholders shall be held in the City of Wilmington, on the second Monday of January in each and every year hereafter, at which time and place an annual election of directors shall be made by the stockholders, and fifteen days' notice of the time and place of each stated meeting shall be given, by advertisement, in at least three newspapers. The election shall be by ballot, and each share of stock shall entitle the holder thereof to one vote, to be given either in person or by proxy, provided it has been held for three calendar months before the time of voting. The directors shall, after the first and each subsequent election, choose by ballot one of their own number to be president of the said body corporate, who shall serve one year or until the election of a successor. The omission to hold an election for directors at the time prescribed shall in no wise affect the said body corporate, but such election may be had upon due notice from the said president and directors, published as aforesaid, at any time within three months after the time so prescribed as aforesaid. The directors shall hold *Page 170 
their offices for one year, and until a new election shall take place; and the powers of the said president and directors shall be the same as are now vested in the president and directors of the Wilmington and Susquehanna Railroad Company. The president may be removed from his office by a vote of two-thirds of all the directors. The directors may, in each year that they may deem it advisable, elect a vice-president from their own number, who, in the absence of the president shall have all the powers of the president, and shall be liable to removal in like manner as the president. Five directors shall constitute a quorum for the transaction of business. The directors may, if they shall deem it advisable, appoint an executive committee, consisting of six members, from the States of Pennsylvania, Delaware and Maryland, for such time and for the performance of such duties as any resolutions of the directors or any by-law may prescribe and assign, and the president or vice-president and any two members of such committee shall constitute a quorum thereof. All officers and agents of the corporation, other than directors, shall be appointed by the directors, who may prescribe and exact such security as they may deem proper for the performance of their duties.
Fifth. — The stated meetings of the board of directors shall be held alternately at Wilmington and Philadelphia, and special meetings may be held either at Wilmington, Philadelphia, or Baltimore. The corporation shall have offices opened at Wilmington, Philadelphia, and Baltimore, at either of which, transfers of stock may be made under such regulations as the board of directors may prescribe.
Sixth. — All by-laws shall be made, altered or repealed only by a majority, consisting of not less than two-thirds of all the directors, it being understood that no by-laws shall contravene any of these terms or stipulations; and the existing by-laws of the Wilmington and Susquehanna Railroad Company shall, until altered or repealed as aforesaid by the by-laws of this corporation, be the by-laws of this corporation, and all rules and regulations necessary for *Page 171 
the management and conduct of the business of the company not provided for in a by-law may be made by the directors.
In witness whereof the said corporations, parties to this agreement, have caused their respective corporate seals, attested by the signatures of their respective presidents, to be hereunto affixed the day and year first hereinbefore written.
[L. S.] JAMES PRICE, President of the Wilmington and Susquehanna R. R. Company.
[L. S.] J. J. COHEN, JR., President of the Baltimore and Port Deposit R. R. Company.
[L. S.] MATTHEW NEWKIRK, President of the Philadelphia, Wilmington and Baltimore R. R. Company.
 STATE OF DELAWARE, NEW CASTLE COUNTY. 
 I, Richard G. Cooper, Prothonotary of the Superior [L. S.] Court of the State of Delaware, in and for New Castle County, do hereby certify that the above and foregoing is a true copy of the docket entries in the said case, together with a true copy of the original case stated therein filed, and the order of the Superior Court made therein, as the same now remains of record in the Superior Court at New Castle.
In testimony whereof I have hereunto set my hand and affixed the seal of the said Superior Court at New Castle, the first day of March, A. D. eighteen hundred and seventy.
 RICHARD G. COOPER, Pro'y.
The following is a copy of the Act of the General Assembly of the State of Delaware, passed on the 11th day of August, 1864, entitled "an act to raise revenue for this State" referred to in the case stated:
SECTION 1. Every person, corporation or association or company of persons not a corporation, engaged or that *Page 172 
may hereafter engage in the business of transporting or carrying passengers by steam power, whether on land or water, in, through, upon, over or across any portion of this State, or within the territorial limits of the same, shall, on the first day of October next and thereafter monthly on the first day of each month or within five days thereafter, pay into the hands of the State Treasurer for the use of the State, a tax at and after the rate of ten cents for every passenger so transported within this state during the month then just ended.Provided, That when the transportation of a passenger shall be by railroad and the direction and length of his journey shall be such as to require him to travel upon more than one road on the same occasion, there shall be but one tax paid to the State Treasurer, and that shall be paid by the person, association or company or corporation upon the road used by which his journey begins. In estimating the number of passengers referred to in this section, all persons carried who are soldiers or sailors of the United States shall be omitted.
SECTION 2. Within five days next after the end of any month, it shall be the duty of the person conducting the aforesaid business of transporting passengers or (in case an association or company of persons or corporation be so engaged) of said association, company or corporation to make a statement to the State Treasurer, verified by the oath or affirmation of their Treasurer or Keeper of their funds, of the number of passengers carried on account of whom they are subject to the tax aforesaid, and also to pay over to him the tax or duty aforesaid. Any failure to do this shall, in the case of an individual person or company or association of persons not incorporated, so transporting or carrying passengers, be deemed a misdemeanor and subject the offender on conviction by indictment to a line of one thousand dollars; and in the case of a corporation, the said failure shall work a revocation of its charter and the same shall from thenceforth be deemed and taken to be and shall be absolutely revoked. And further, in case of any individual person or company or association *Page 173 
of persons as aforesaid, so failing, it shall be unlawful for him or them thereafter to prosecute or conduct or be concerned in the carrying of passengers as aforesaid in this State, and if he or they shall presume to pursue said business they shall be guilty of a misdemeanor, and on conviction by indictment, be punished by fine not less than one thousand dollars, and imprisonment not less than one year.
SECTION 3. The Court of Chancery shall have jurisdiction and power, and upon the application of the State Treasurer on behalf of the State, it shall be the duty of the Chancellor to restrain, by injunction process, any breach of this act, in carrying passengers, after failure to make the statement and payment or either of them provided for by the second section of this act. And further, in case of any failure by any corporation to comply with the terms of this act applicable to it, the State Treasurer shall report the fact immediately to the General Assembly, if in session, or at their next meeting either regular or adjourned, and also to the Attorney General, whose duty it shall be to proceed without delay against the said corporation in the proper tribunal, to carry the aforesaid revocation into effect.
SECTION 4. In case there be in the charter of any corporation liable to the provisions of this act, any clause or provision so restricting the amount of toll to be charged for the transportation of passengers as that this act would according to the present rate of charges by the said corporation operate unjustly against it, then it is hereby declared and enacted that the said corporation shall have the right to increase the said toll to the amount of the tax herein provided for.
SECTION 5. The State Treasurer shall have and exercise every necessary power to enable him to ascertain the tax payable according to the provisions of this act, and he may enforce the payment of the same and all the provisions of chapter 29, of the Revised Code of this State, conferring power, c., upon that officer and his collectors in relation *Page 174 
to the execution of the warrant issued to him by the Auditor for the collection of the State tax, shall be vested in and may be exercised by him and them in the collection of the tax provided by this act.
SECTION 6. The condition of the official bond of the State Treasurer shall extend to the money received under the provisions of this act, and to the performance of the duty of collecting the aforesaid tax, which duty is hereby imposed upon him.
SECTION 7. The Secretary of State shall cause a copy of this act, duly certified to be published immediately in all the newspapers of this State, and to be kept published therein for the space of three months.
Eli Saulsbury, for the plaintiff. The grounds on which the constitutionality of the act of the Legislature of this State involved in the case, would be contested on the other side were first, that it contravened that provision of the constitution of the United States which confers upon Congress the power to regulate commerce between the States, but the delegation of that power was for the purpose of raising revenue to defray the expenses of the federal government, and to prevent discordant and conflicting regulations of foreign and domestic commerce by the legislatures of the several States. Resolutionof Congress in 1783. The Federalist, 5. The term commerce included traffic; but it signified more than that, for it included commercial intercourse of every kind between the people of different nations and states, and parts of states, and what was meant by regulating it, was prescribing the rules by which it should be carried on and be controlled and governed, and the power to regulate it, was the power, of course, to prescribe the rules by which commerce or commercial intercourse in all its branches is to be governed. Gibbons v. Ogden, 9 Wheat. 189. There was nothing, however, in the act of the legislature in question which looked to or pretended to prescribe any regulation for the government of commerce between this and other states or parts of the *Page 175 
world, in the sense in which the term was employed and the power was conferred on Congress in the constitution of the United States, for it merely imposes a tax of ten cents on every passenger traveling upon any part of the railroad of the defendants within the limits of this State, for State revenue, and nothing more, so far as this case was concerned. But it had been recognized by the highest tribunal, the Supreme Court of the United States, that there is a concurrent power residing in the States, to regulate commerce between them and other States, and even foreign countries, unless Congress has legislated on the subject in such a manner as necessarily to preclude legislation upon it by the States; and that the mere grant to Congress, of the power to regulate commerce in the terms employed in the constitution, does not prohibit the exercise of the power by a State over the same subject. Wilson v. TheBlackbird Creek Marsh Co. 2 Pet. 245. License Cases, 5 How. 578. City ofNew York vs. Milne, 11 Pet. 151. Cooky vs. The Board of Wardens ofPhiladelphia, 12 How. 318. Gilman vs. Philadelphia, 3 Wall. 724.
The enactment of the statute in question was the exercise of a power by the legislature of this State which had only been exercised by legislatures of the State since the existence of railroads in them, the creatures of their own power and making, and over which Congress had never yet attempted to exercise any power under that provision of the constitution, or to prescribe any regulation whatever. He had said, what was apparent upon the face of it, that it was no part or purpose of the act to regulate, or to prescribe any regulation in relation to the commerce or conveyance of passengers on the railroad of the defendants within or without the limits of this State. But even conceding that it might have the indirect or incidental effect to affect the latter kind of commercial intercourse between citizens of other States traveling on it, such incidental effect merely could not render it unconstitutional.License Cases, 5 How. 615. Nathan vs. Louisiana. 8 How. 80. The sole object of the act is simply a tax for State revenue; *Page 176 
but it had been held that the State may tax, although it cannot regulate, foreign commerce. Passenger Cases, 7 How. 402. And taxing a railroad is not regulating commerce. Cumberland Road Case, 3 How. 151.Veazie vs. Moor, 14 How. 568. Hudson County vs. The State, 4 Zabr. 728. The act in question being a measure of State revenue, was duly enacted in the exercise of the rightful power and authority of the legislature to levy taxes. The Federalist, No. 32, p. 249. Gibbons vs. Ogden, 9Wheat. 189. Brown vs. State of Maryland, 12 Wheat. 438. McCullough vs.Maryland, 4 Wheat. 429. City of New York vs. Milne, 11 Pet. 151. Westonvs. City of Charleston, 2 Pet. 467. Crandall vs. Nevada, 6 Wall. 35. The States may tax every thing which exists within their respective limits, either by their authority, or by their permission. License Tax Cases, 5Wall. 464. Biddle vs. The Commonwealth, 13 Serg. Rawle, 409. Nathanvs. Louisiana, 8 How. 80. Thompson vs. The Union Pacific R. R. Co., 9Wall. 579. The tax imposed by the act was a tax on the business of the railroad company to be ascertained and graduated by the number of passengers carried, and not upon the passengers directly, and was, therefore, in no sense a commercial regulation as between it and other States, but was such a tax as the State had the power to constitutionally impose upon the property and business of the company within its own limits. The Commonwealth vs. P. R. R. R. Co.,62 Penn. 286. And there was nothing in the union and consolidation of the railroad company originally incorporated by the legislature of this State, with the railroad companies likewise originally and respectively incorporated by the legislatures of the adjoining States of Maryland and Pennsylvania, for the purpose of constructing the present railroad of the defendants from Philadelphia through this State to Baltimore, into one united company that could in any manner impair, abridge, or diminish the power of this State to tax the property and business of the consolidated company within its limits. O. M. R. R. Co. vs. Wheeler, 1Black. 286. Farnew vs. Blackiston Ohio *Page 177 Canal Co., 4 Sum. 47. State vs. North Scott, 27 Mo. 464. There is no discrimination whatever in the act in favor of the citizens of this State in regard to the tax, for they were all alike subject to it when traveling upon any part of the road, however short it might be, within the limits of the State.
The act does not interfere with or impair the right of the officers or servants of the Federal Government to travel or pass through the State. He had already said that the tax in question was not a tax on the passenger, but on the railroad company, to be measured by the number of passengers carried upon any portion of their road in the State, and was to raise revenue for the support of the State government and to pay its debts, and more particularly, the large debt contracted by it in supplying troops to the armies of the United States during the exigencies of the late war. For until those great emergencies arose about the time of the passage of the act, which was in 1864, we never had any such tax, and we never should have had any such tax in the State, but for the heavy debt which the war had entailed upon it. The language of the law is that the company, or any other corporation or persons engaged in the business of carrying passengers for hire in this State, "shall pay at and after the rate of ten cents for every passenger," and that was not only in terms, but in its direct effect, a tax on the company, and not upon the passenger, for it was entirely optional with the company whether, or not, it would require him virtually to pay it by increasing the fare pro tanto. But whether that was done, or not, the company, and the company alone, was subject to, and bound to pay it. Society of Savings vs. Coit, 6 Wall. 594. The case of Crandall vs. Nevada would be referred to on the other side, but the statute of that state involved in that case, imposed a capitation tax of one dollar upon every passenger going out of the State or through it, but not on any one going into it, or from one point to any other within its limits; and the court very properly held that it was a personal tax *Page 178 
imposed directly on the passenger, although the point was made by the counsel for the State that it was not a tax on the passenger. But in this case the statute of our State is different, for it was as he had already shown, under the law of this State a tax upon the carrier, and not upon the passenger.
The act was not obnoxious to the ojection that it impairs the obligation of any contract, either express or implied, between the State and the company under the provision of the nineteenth section of the original charter of what was then named the Maryland and Delaware Railroad Company, and whose road, rights and franchises now constitute a part of the road rights and franchises of the present united and consolidated company, the defendant in this case. It was under that provision since the union of the companies that the original exemption from taxation of that road by the State of Maryland, it would be contended, was now extended and would apply to the whole road of the company as at present constituted, as well in Delaware and Pennsylvania, as in Maryland, both by its express terms, and by necessary implication. But there was nothing in the act of this state authorizing and providing for the union and consolidation of the several companies into one company, which warrants any such pretension, as against this State, at least. There was no consideration paid to the State for the act to authorize the consolidation of them, and unless the exemption from taxation is dear and explicit, or for a valuable equivalent, and even then, only for a specified and determinate period, it is void. Besides, a strict construction of railroad and other like charters, was now the well settled rule of American law on that subject, and no court will ever infer or presume such an exemption without express and unequivocal words which cannot be otherwise interpreted. Pierce's American RailroadLaw 9. Dartmouth College Case, 4 Wheat. 636. Rice vs. The Railroad, 1Black. 380. Providence Bank vs. Billings, 4 Pet. 561. P., W. B. R. R.Co. vs. Maryland, 10 How. 393. Ohio L. J. T. Co. vs. De Bow, *Page 179 16 How. 416. Gordon vs. Appeal Tax Court, 3 How. 144. New Jersey vs.Wilson, 7 Cranch 164. State Bank of Ohio vs. Knoop, 16 How. 369. City ofBaltimore vs. B. O. R. R. Co., 6 Gill 295. Washington University vs.Rouse, 8 Wall. 442. Bank of Pennsylvania vs. The Commonwealth, 19 Penn.Easton Bank vs. The Commonwealth, 10 Barr 443. Redf. on Railways, 531.
Smithers, (Gordon with him) for the defendants. The object of the act was to raise revenue for the support of the State government, and the tax is the specific sum of ten cents for every passenger, whether he goes but a few miles or throughout the entire State. An act of the legislature of the State of California imposing a stamp tax on bills of lading for the transportation of gold from that State, was held to be a tax on exports, and was consequently void. The court considered the intention to impose the tax on the gold exported, by imposing it on the bill of lading, was too plain to be questioned. Almy vs. California, 24How. 169. If this is a tax on the passenger in his transit into or through the State, united and consolidated as the original railroad companies had been into one, and their roads made one, two out of the three original roads thus united and made one, one being in Pennsylvania and the other in Maryland, and this having been done with the mutual sanction and consent and by the authority of all three of the States acting through their respective legislatures, what right has this State to restrict travel over it to and from those States, or any other part of the country, to even the slightest degree, without the consent of those States?
According to the definition given by C. J. Marshall in Gibbons vs.Ogden of the term commerce and the regulation of it, it means intercourse, and embraces travel as well as traffic; and it was so considered and held by the court in the cases also cited on the other side, of McCullough vs. Maryland; Crandall vs. Nevada; and in Ex ParteCrandall vs. Nevada, 1 Nevada 294. Where the object of the act is to *Page 180 
raise revenue by taxation, the power to regulate commerce is not in the State. It is never allowable in a State when such is the operation or effect of it. Passenger cases, 7 How. 470. In those cases the Judges differed in their opinions as to the construction of the different statutes of the several States involved in them. In regard to the New York statute, the argument was on the first branch of it relative to passengers from foreign ports, and the question was whether it constituted a tax and a regulation of commerce; but where that was clear, as a matter of fact, the opinion was just as clear that the law was as he had just announced it. And it was so held in the LicenseCases, 5 How. 605. McCullough vs. Maryland, 4 Wheat. 428. Weston vs.City of Charleston, 2 Pet. 467. Gilman vs. Philadelphia, 3 Wall. 730.Cooley vs. Philadelphia, 12 How. 300. Searight vs. Stoker, 3 How. 170.Veasie vs. Moor, 14 How. 568. In the case cited on the other side of theCommonwealth vs. P. R. R. R. Co., the court did not question the propriety of the decision in the case of Crandall vs. Nevada, but distinguished it from the case then before the court. And in the case ofThompson vs. The Union Pacific R. R. Co., the only question was whether the State had the power to tax the property of the company within its limits, and in which the power of the State to do that was affirmed. The governmental regulations of trade and commerce by states and nations were usually prescribed and enforced by some method of taxation with a view to public revenue, and which in general is the primary, if not the sole object of them. Foreign commerce usually by impost duties collected at ports of entry established by authority of the State for that purpose, and where alone the commodities allowed to be introduced for sale, can be lawfully imported into the country; and domestic commerce in the main by taxes imposed by law in the form of licenses or other excise duties, sometimes with a view to restrict or regulate certain branches of internal trade or traffic, but generally and primarily for the same purpose as the other, to raise public revenue for the support of government. And any law *Page 181 
for that purpose which had the effect, either directly or indirectly to interfere with or affect the commerce of a country, whether foreign or domestic, was generally recognized and denominated throughout this country and England, at least, before and at the time of the formation and adoption of the constitution of the United States, as a commercial regulation, and that was the broad and comprehensive and well known and well understood sense in which the intelligent and enlightened framers of the constitution of the United States employed, to them the familiar terms, "to regulate commerce" (penned and expressed with care, as every other passage was in that instrument) which were adopted and incorporated into the commercial clause of it. The travel of passengers, whether on business or pleasure, is a branch of commercial intercourse between States and nations, and wherein does a tax on travelers on coming into or going out of the State, imposed for public revenue, differ in principle and in the purview of that clause of the constitution, from a tax imposed for the same purpose on any other branch of commercial intercourse between the States of this Union? A tax on such a traveler is per se a commercial regulation, because it prescribes a requirement with which he must comply before he can lawfully exercise the right or privilege which the regulation on that condition concedes to him; and it was no answer to that to say that the act in question does not operate upon him directly, or directly require him to pay the tax, but only the railroad company to do that which it may or may not do at its option, for it is manifest that it contemplates that the passenger shall pay the tax, because it absolutely requires the company to pay it, and at the same time specially provides that it shall have the power to increase the fare to the amount of the tax, if it did not already possess that power before the passage of, and independent of the act itself. And it was to prevent the general inconvenience and evil of a serious interference with the domestic commerce of the whole country, that is to say, the commerce among the States and with the Indian *Page 182 
tribes by the several State governments, that the provision in regard to those particular departments of commercial intercourse, was inserted in the clause referred to, and the exclusive power to regulate it, as he contended, by such or any other means, was expressly delegated to Congress, other and more specific provisions of the constitution reserving to Congress the control and regulation of the foreign commerce of the country in the several modes provided for in it. He would, therefore, conclude what he had to say on the subject by adding that the act in question, both on the authorities cited by him, and the evident meaning and design of the provision of the constitution which he had been considering, was to his mind clearly unconstitutional as an attempt on the part of this State to interfere with and regulate, in the sense in which that phrase is employed in the constitution, commercial intercourse between it and the other States of the Union, so far as that intercourse was conducted over and by means of the railroad of the defendants, which was a great national thoroughfare, and in the direct line of communication between two great commercial sections of it.
T. F. Bayard, for the plaintiff. The Government of the United States was formed out of the States of the Union with limited and delegated powers for the benefit and welfare of the whole confederation, and to have charge of the great concerns which pertain to it. The eighth section of the first article of the constitution of it, among other provisions, confers on Congress the power to lay and collect taxes, duties, imposts and excises; and to regulate commerce with foreign nations, and among the several States, and with the Indian tribes; and the provision contained in the second paragraph of section ten of the same article, that no State shall, without the consent of Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws, the net produce of which should be for the use of the treasury of the United *Page 183 
States, nor without the consent of Congress lay any duty of tonnage, were to be considered and construed with the former, in order to apprehend the true and proper meaning of them, and the powers conferred by them, as qualified and indicated when considered in connection with each other. And the first legitimate inference and deduction to be derived from them, when thus viewed and considered together was, that the several States were not to be prohibited from laying or imposing any taxes, except as is therein limited and provided. The power of a State to regulate or tax foreign commerce is expressly prohibited in explicit terms in the provision which he had read that "no State shall, without the consent of Congress, lay any imposts or duties on imports or exports," except as therein provided, and then only, so far as the net receipts from them were concerned, for the use of the general government. A State, however, was not to be prohibited from laying taxes, except as is limited and provided in the clauses of the constitution which he had just read. And such was the construction which Chief Justice Taney had given to the definition of Chief Justice Marshall of the term commerce, and the power of Congress to regulate it with foreign nations, and among the several States. Gibbons vs. Ogden, 9Wheat. 1. The Passenger Cases, 7 How. 479. If then there is an express and positive prohibition incorporated into the constitution against a State's laying any tax on foreign commerce, if it was the design of the framers of it to deny them the right and power to tax domestic commerce, or commerce between the States, why was not an express prohibition also incorporated in it to that effect? Or why should it be left to be inferred or implied merely from the grant to Congress of the general power to regulate commerce? But would you go to that clause of the constitution to find by implication merely the power of Congress to tax by imposts or duties the foreign commerce of the country? Certainly not, because that power is expressly conferred by the clause almost immediately preceding it, *Page 184 
and that was itself conclusive proof of the fact that the authors and framers of the instrument never intended that the power of Congress to tax foreign commerce should or could be derived by implication from the power given to it to regulate it merely. Nor can you, for equally as strong and sound a reason, resort to the latter clause to find by implication simply the power of Congress to tax domestic commerce, or commerce among the several States. Because the latter power is also expressly given in the same clause by which the power to tax foreign commerce is conferred. It is a sound rule of construction of such instruments that we are never to depend on implications merely from any provision in it for a power which is conferred by the express terms of it. But there were other ways of regulating commerce, both foreign and domestic, than by the taxation of it, for the power to regulate it, and the power to tax it were not necessarily one and the same power. On the contrary, the distinction between the two powers was clearly recognized in the constitution itself. For while the power to regulate commerce is conferred upon Congress in the few general words which he had so often repeated, without any express restriction or exception whatever with reference to the power of the States to regulate it, the power to tax it is conferred and prescribed in several specific provisions relating to the subject, with the express restriction that no State shall tax commerce with foreign nations, without the consent of Congress, except as therein mentioned, and for the purpose therein stated. And if we are to have recourse to constitutional implication to ascertain the meaning of it in either of these respects, does not that restriction much more reasonably and legitimately imply that any State may tax commerce among the States, or with the Indian tribes without the consent of Congress for the use of its own treasury, than it is implied that no State shall have the power to tax those two branches of commerce, because another power, the power to regulate such branches of commerce is exclusively conferred *Page 185 
on Congress, as is contended for on the other side?
But conceding for the sake of argument, that Congress has under the commercial clause in the constitution, the sole and exclusive power to regulate commerce with foreign nations, among the several States and with the Indian tribes, it will not be contended that its power to tax is sole and exclusive, or be denied that while its power to tax property or commerce within the limits of any State, is co-extensive with the power of that State to tax the same, it is only a concurrent power with that of the State over the same subject matter; and which consideration would serve to show that there is, and must be a manifest distinction recognized in the constitution itself, between the power to regulate and the power to tax commerce. Indeed, he might say that there was not a provision in it relating to either power, that did not unequivocally discriminate the one from the other, and indirectly recognize a distinction between them. The distinction was also clearly recognized and stated by Chief Justice Marshall, in the opinion announced by him in the case of Gibbons vs. Ogden, 9 Wheat. On that subject the Federalistsays "I am willing to allow in its fullest extent the justness of the reasoning which requires that the individual states should possess an independent and uncontrollable authority to raise their own revenues for the supply of their own wants. And making this concession, I affirm that (with the sole exception of duties on imports and exports) they would under the plan of the convention, retain that authority in the most absolute and unqualified sense; and that an attempt on the part of the national government to abridge them in the exercise of it, would be a violent assumption of power unwarranted by any article or clause of its constitution." The Federalist, No. 32. The decision of the court in the case of McCullough vs. Maryland, 4 How. 427, simply was that a State cannot tax within its limits, any means established by the General Government for the execution of *Page 186 
its functions, or so as to defeat their legitimate operation; but no such point or principle is presented in this case, for the means there referred to was the Bank of the United States, an institution incorporated by an act of Congress, and used as a fiscal agent by the General Government.
But upon whom does the act in question directly operate? It is expressly directed against the defendant as a common carrier of passengers within the limits of this State for hire, and as an incorporated company, although now consolidated with other similar companies originally chartered by Maryland and Pennsylvania respectively, but so far as this State is concerned and within its limits, it still exists as a body politic or corporation, solely by virtue of the laws of it, and the tax which it imposes is but an equivalent for the grant and use of the valuable franchise conferred upon the company by the State. Society for Savings vs. Coit. 6 Wall.606. Besides, it operates, and can operate, upon no one else unless he is, and no longer than he is, within the limits of the State. No case had been cited, and none could be, in which it had ever been held that a State cannot tax an artificial highway within its limits, and especially when it is instituted and made under the express authority and sanction of the State itself, and is endowed with the delegation of a certain portion of the eminent domain of it. Searight vs. Stokes, 3 How. 180. But what was meant by the phrase on the other side, "the free right of transit" over such a highway? Although the company was incorporated by a public statute of the State, and is what is usually denominated a corporation for public uses, and the road itself a public Improvement, yet the road itself was after all, but the private and absolute property of the company, and no one could use it free, or without its consent and without paying the company for any benefit derived from the use of it. All persons, both in and out of the State, in that respect stood in the same relation to it, as much so as if it were the sole and absolute property *Page 187 
of any private citizen. Gray vs. Clinton Bridge, Am. Law Rgr. Jan. 1863,p. 149.
It is not denied that the State has the right to tax the road or any other property of the company within its limits, but every tax so imposed is indirectly and ultimately paid by the passengers and shippers over it. And even, conceding that the tax in question is a direct tax on the passengers over the road of the defendants, where is practically the difference between the two cases? But the tax is, in fact, a tax, not on the passengers directly, but on the franchise of the company as a common carrier of passengers for hire, and on that particular department of its business directly, to be measured and graduated according to the amount of business done in that line, at the rate of ten cents for every passenger carried on the road, or any part of it within the limits of the State. It was, therefore, in point of fact, neither a tax on inter-State commerce in the true sense and meaning of the implied prohibition contended for on the other side, nor was it, as he had before shown, he thought, an act to regulate such commerce within the proper meaning and construction of the clause of the constitution referred to. But even if the evident purpose of the act had been unquestionably to regulate commerce among the States, it would still not have been in conflict with that clause of the constitution which merely confers upon Congress the power to regulate it, without conflicting with some act of Congress previously enacted to regulate it, because the executory power of Congress to regulate it, without having been exercised and executed by it, and in the only way in which Congress could exercise the power, or regulate it, that is to say, by a law of Congress duly enacted and approved by the President on the subject, could not possibly constitute per se, or in itself practically speaking, any regulation whatever in regard to the matter. Practically that provision of the constitution is wholly inoperative and silent, until Congress has proceeded in due form to act under the power and to prescribe some regulation on the subject; *Page 188 
but which had never been done in relation to domestic commerce or commerce among the States at least. O. M. R. R. Co. vs. Wheeler, 1Black. 286. This is also recognized by all the members of the Court, with the exception of two of the Judges, in the case of Crandall vs.Nevada, 6 Wall. 35; and that until Congress acted under the power and prescribed regulations, the several States have concurrent power and authority to regulate even foreign commerce between them and other countries. The majority of the court rested their decision in that case on entirely new and original grounds, and upon which no other case had ever before been decided in the Supreme Court of the United States. But the Nevada act upon which it was made, was in terms a tax on passengers, and was further obnoxious to objection on the ground that it was particularly invidious and discriminating in its character, as between citizens of the other States and the citizens of that State, who were entirely exempt from the tax, except when going out of it. No one was taxed, however, under it on going into, or traveling about any where within its limits; but every person going entirely through the State, or once in was going out of it, was liable to a capitation tax therefor of one dollar. The primary object of such an act, with such discriminations in it, is palpable. It was, as far as it could effect such a purpose, first, to prevent its own citizens from leaving it, and in the next place, to keep every body there who once went into it, and as such it was evidently designed to be a direct restriction on that kind of inter-state commercial intercourse, and was an act to regulate, rather than to tax that kind of commerce to raise revenue. And in that view it was even unconstitutional and void with reference to its own citizens, for under the commercial clause of the constitution, no State has the power to restrain its citizens from leaving it or going out of it into another State, any more than it has the power to prohibit the citizens of other States from going into it. Our common citizenship under another clause of the constitution, would also forbid either of such *Page 189 
restrictions. In the case of the Erie R. R. Co. vs. New Jersey, 4 Am.Law Regr. Feb. 1866, p. 238, the act in question imposing a transit duty upon passengers and freight carried by companies doing business in the State, but not incorporated by the legislature of it, was held to be unconstitutional, not because it incidentally affected commerce between that and other States, but because it discriminated in favor of the citizens of their own, and against citizens of other States. But in the act now before this court, the discrimination is just the reverse of that, for as the tax is the same whether the travel is entirely through the State, or between any two stations on the road within the limits of it, however near they may be to each other, and such travel is almost entirely by our own citizens, it is practically a discrimination against the citizens of this, and in favor of the citizens of other States. In the Passenger Cases, 7 How. 492, Chief Justice Taney had prescribed the true test, after all, by which this vexed question was to be determined, and that was this: if you can find any thing in an act to indicate a design to interdict, or to ruinously affect the commerce of the States, then he was free to say that it should be considered and declared to be inoperative and void. And in the case of Thompson vs. U. P. R. R. Co., 9Wall. 579, the following rule was pronounced in the opinion of the Judges that if the act is directed against the business of the company, and makes no provision for, and gives no direction as to how it is to be collected, or whether it was to be paid to the company by any body else or not, and although practically paid in the end by the passenger, yet it is no more paid by him than the wages of the engineer who runs the engine is paid by him. And so we say in this case, and will cheerfully abide the application of either of these tests to it.
The Supreme Court of the United States have decided in Crandall vs.The State of Nevada, 6 Wallace 35, that the several States of the Union have not the constitutional *Page 190 
power to impose a tax upon inter-state travel. In this conclusion the Supreme Court was unanimous. The authority of the decision is not impaired by the fact that the judges assigned different grounds for their respective opinions. Some of them considering that such a tax is a regulation of commerce, and prohibited to the State Legislatures by what is known as the commercial clause of the Federal Constitution, and others, (who constituted the majority of the Court,) holding that the tax is an infringement of the right of the Federal Government to the service of its citizens, free from all restrictions upon their facilities for travel. Also an infringement of the citizen's right of free transit between all parts of the common country, as a right inherent in a national citizenship and protected by the constitution. The rule adjudged in the Nevada case is the supreme law of the land, and obligatory upon this Court. Waiving, therefore, a discussion of the grounds of that decision, we proceed directly to the main question in controversy, that is, whether according to the true construction of the act of August 11th, 1864, the tax is imposed upon the business of the carrier, measured by the number of passengers transported, or whether upon the passenger, to be collected for the State by the carrier. If it be the latter, then under the ruling of the Supreme Court, the act must be held invalid so far as it operates upon persons entering into, departing from, or passing through the State. With respect to its operation upon persons traveling between different points within the State, no question is made. It may as well be observed at this point, that no argument in support of the act can be drawn from the fact that it operates as well upon our own citizens traveling wholly within the State, as upon the citizens of other States passing into or through its territory. If the Legislature have not the constitutional power to tax a particular class of passengers, plainly that power cannot be derived by including under the tax law another class of passengers who may constitutionally be taxed. Legislative acts to the validity of which the question of discrimination *Page 191 
becomes material, are those which deal with a subject matter fully within the constitutional power of the Legislature of a State, but deal with it in a mode affecting unequally its own citizens and the citizens of other States, contrary to that clause of the Federal Constitution which secures to the citizens of each State "all privileges and immunities of citizens of the several States." — (Art. 4, Sec. 2d). As if citizens of other States should be placed upon an unequal footing with our own citizens under laws for the administration of public justice or touching the descent of real estate, or the distribution of the personal estate of intestates; or, as if in the taxing of lands situated within the State, non-resident real estate owners were taxed more heavily than our own citizens holding lands. But in the present case the Supreme Court having decided that inter-state travel is beyond the taxing power of the State, the only question is whether this act undertakes to tax the forbidden subject-matter; and it is quite immaterial whether the act also operates upon travel within the State, a subject-matter under State control.
We will now examine the provisions of the act of 1864. It is true that the tax is declared to be a tax upon the carrier, that he is required to pay it into the State Treasury, and he is to pay it at all events, whether it be in fact collected out of the passenger or not. The provision is. (See. 1.) that "every person, corporation, or association or company of persons not a corporation, engaged, or that may hereafter engage in the business of transporting or carrying passengers by steam power, whether on land or water, in, through, upon, over or across any portion of this State, or within the territorial limits of the same, shall on the first day of October next, and thereafter monthly, on the first day of each month, or within five days thereafter, pay into the hands of the State Treasurer, for the use of the State, a tax at and after the rate of ten cents for every passenger so transported within this State during the month then just ended." Did the act stop here, or add only such provisions as should be requisite for ascertaining *Page 192 
the number of passengers and for enforcing payment by the carrier of the ten cents per head, then the tax might be treated as one imposed upon the carrier. But there are other provisions in the act, by the operation of which the tax although in terms levied upon the carrier, was nevertheless in the contemplation of the legislature and under the authority of the act, to be drawn from the passenger, so as to leave no actual charge upon the business of the carrier. This makes it in substance and effect a tax upon the passenger.
Let us look closely into these provisions: — First, observe the 4th Section. This section confers authority for collecting the tax in all cases out of the passenger; that is, it confers the power to do so upon a class of corporations previously restricted by their charters as to the amount of tolls to be charged for the carriage of passengers; and it recognizes the power and sanctions its exercise on the part of all other corporations and carriers which had not been so restricted. The section runs thus: — "In case there be in the charter of any corporation liable to the provisions of this act, any clause or provision so restricting the amount of toll to be charged for the transportation of passengers, as that this act would according to the present rate of charges by the said corporation, operate unjustly against it, then it is hereby declared and enacted that the said corporation shall have the right to increase the said toll to the amount of the tax herein provided for." Now, the manifest purpose of this provision and its direct effect is to carry the tax over from the carrier on whom the first section left it, to the passenger. It declares that to leave a corporation disabled by reason of any existing restriction upon its power to charge tolls, from adding the ten cents to its fares, would "operate unjustly against it," and so, striking away all such restrictions, it leaves all carriers armed with authority and having its express sanction to draw the tax out of the passenger, as being his proper charge or burden, and not theirs. The want of power in a corporation to collect the tax from *Page 193 
the passenger would, indeed, "operate unjustly" against the corporation, if it was the passenger who was intended to bear the tax, but certainly not so, if the tax was considered the carrier's own burden. In the latter case plainly the injustice to be prevented would be, not the absence of power in some corporations to collect the tax from the passenger, but the exercise of such a power by any corporation; and in order to keep the burden where, upon the plaintiff's theory, it was intended to rest, the act should have extended to all carriers the restriction against adding it to their fares, rather than have removed it from those already subject to it. It is impossible not to see disclosed on the face of this act, that the proposed tax was expected to raise a gross sum too large to be borne by the railroad corporations under the then existing rates of fare which had been adjusted to the ordinary cost of transportation, and hence the care manifested to connect with the exaction of the tax from the carrier authority for its collection out of the passenger — this power being a part of the machinery devised by the act for raising the revenue. The position of the carrier under this law is substantially that of one to whom public taxes are farmed out, and who undertakes by contract to advance to the Government a required revenue, with power by suit or distress to collect the like amount out of those on whom the tax is laid. The only imaginable difference is, that in the case of taxes farmed out the obligation to account to the Government is voluntarily assumed by contract, and not imposed by law as upon the carrier under this act; also that different means are provided for raising the tax out of those ultimately chargeable with it; but the mode of collection under this act is none the less effectual, but far more so than by suit or distress, for the tax is exacted from the passenger before he is allowed to enter a car or steamboat.
Another provision of this act very significant that under its operation the passenger was to be the taxable, and the carrier a collecting agent only, is that clause of Sec. 1 which excludes soldiers and sailors of the U. S. *Page 194 
from among the number of passengers with respect to whom the carrier is required to make return and pay the ten cents per head. We cannot read this clause otherwise than as an exemption of these two classes of passengers from a burden imposed upon passengers generally, a burden to which it was felt to be improper or inexpedient to subject the transportation made at that period, of large bodies of soldiers and sailors in the service and defence of the Federal Government. Considered as a tax upon passengers, there were cogent reasons for exempting from the burden of it these classes of passengers, or the United States Government as chargeable on their account; but upon the theory that this was a tax upon the business of the carrier, the number of passengers being taken merely as a measure of the business, no satisfactory reason can be assigned for exempting this branch of the business, unless soldiers and sailors were carried without charge, but which does not appear as a fact.
Still another clause of the act bearing to the same conclusion, is that proviso of the first section which imposes only one tax in respect of a passenger traveling over several connected railroads, and charges the payment of that one tax upon the company which first receives the passenger. If the tax be considered as laid upon the passenger, to be paid for the privilege of making one journey by the public modes of travel within the States, this is a provision both just and convenient; but it is not reconcilable with the theory that this is a tax levied upon the railroad company for the privilege of exercising a public employment, in which aspect it should equally attach to each company exercising such privilege, whether the passenger conveyed by it was received from another company or not. Nor is this clause satisfactorily accounted for, consistently with the theory of the plaintiff, by the suggestion made arguendo that all the railroad companies then operating within the State were under the management of one corporation, the defendant in this cause. Our railroad system at the passage of this act embraced three companies *Page 195 
then operating, viz.: — this defendant, the Delaware Railroad Company, and the Junction Breakwater R. R. Co., besides some other roads, projected but not constructed. Of the three Companies then operating, the Delaware Railroad was managed by this defendant as lessees under a lease which kept the business and interests of the two companies as a separate and distinct as if the Delaware Railroad Company were operating its own road. The Junction Breakwater Railroad was operated by this defendant, the Philadelphia, Wilmington Baltimore R. R. Co., under contract. Between this defendant and the two Railroad Companies referred to, there was no consolidation of business or interests, and the arrangement between them afforded no sufficient reason for exempting either of the companies from a tax intended to be laid upon the business of railroad transportation.
Passing now from the consideration of particular clauses in the act to a view of it in its entire scope and bearing, we are unable to discern wherein its operation upon the passenger differs from that of an act which should in direct terms levy the tax upon the passenger, and require the carrier to collect it, and pay it into the State Treasury, after the frame of the Nevada Act; and when we speak here of its operation upon the passenger, we refer not to any mere incidental and remote consequence of the act, but to the result contemplated by and provided for in the act itself. It matters nothing whether the tax be in terms imposed upon the passenger to be collected by the carrier, or be imposed upon the carrier with power, given or recognized and sanctioned to collect it out of the passenger. The difference is one of phraseology merely, not varying in the least degree its effect upon the passenger. Either way there is to be exacted from him, under authority of law, over and above the ordinary charge for the carrier's service, ten cents for the use of the State, to pass it is true through the hands of the carrier, but without becoming any charge upon the carrier's business, unless it be voluntarily *Page 196 
so made by a waiver of the power to collect it out of the passenger, a very remote possibility. Now, it need hardly be said that the Legislature cannot enlarge its powers by mere phraseology; that a revenue measure so constructed as to draw the required revenue ultimately out of the passenger, cannot be rendered valid by calling the payment of it a tax upon the carrier whose whole connection with it is to pass it into the Treasury of the State. No form of words can save a statute which in its effect deals with a prohibited subject-matter. If constitutional limitations might be thus evaded, they would become wholly illusory and worthless.
It is important here to notice with what care the Supreme Court of the United States in applying the limitations of the Constitution to legislative acts, have always looked into the substance and effect of such acts, quite beyond their form or phraseology. We may take a few illustrations: In Brown vs. Maryland, 12 Wheat. 444, the State law required the importer to take out and pay for a license to sell imported goods, and the question was whether such a requirement was in conflict with that clause of the constitution of the United States which prohibits a state from laying any impost or duty on exports or imports. It was argued that this was not a tax upon the article imported, but upon the occupation of the importer; that the State had unquestioned power to tax all occupations, and that this act by its direct effect did nothing more. C. J. Marshall thus emphatically refutes the argument. "It is impossible," he says, "to conceal from ourselves that this is varying the form without varying the substance. It is treating a prohibition which is general, as if it were confined to a particular mode of "doing the forbidden thing.' `All must perceive that a "tax on the sale of any article imported only for sale, is a "tax upon the article itself.' * * * `It must add to "the price of the article, and be paid by the consumer or "by the importer himself in like manner as a direct duty "on the article itself.' `This the State has not a right to do *Page 197 
"because it is prohibited by the constitution." In Almey vs. The Stateof California, 24 How. 169, the question was whether a stamp duty on bills of lading for gold and silver transported from that State was a tax on exports. The Supreme Court so held, C. J. Taney thus expressing himself. "But a tax or duty on a bill of lading, although differing in form from a duty on the article shipped, is in substance the same thing." Speaking of the necessity of some such instrument as a bill of lading to commercial transactions the chief justice adds, "a bill of lading therefore, or some equivalent instrument of writing is invariably associated with every cargo of merchandise exported to a foreign country, and consequently a duty upon that is in substance and effect, a duty on the article exported." In the Passenger Cases, 7 How.283, one of the questions was, whether a provision in a statute of Massachusetts requiring the master, owner, consignee or agent of any vessel engaged in foreign commerce, to pay on account of every alien passenger landed a certain sum into the Treasury of the city or town where the vessel should land, was a tax upon commerce. The majority of the Court so held, and Mr. Justice Grier (p. 188,) with his characteristic force, thus asserts the duty of the court upon such questions, to consider the effect, rather than the form of legislative acts. "It is" he says, "a just and well settled doctrine, that a State cannot do that indirectly, which she is forbidden by the constitution to do directly. If she cannot levy a duty or tax from the master or owner of a vessel engaged in commerce graduated on the tonnage or admeasurement of the vessel, she cannot effect the same purpose by merely changing the ratio and graduating it on the number of masts or of marines, the size and power of the steam engine, or the number of passengers which she carries. We have to deal with things, and we cannot change them by changing their names. Can a State levy a duty on vessels engaged in commerce, and not owned by her own citizens, by changing the name from a duty on tonnage to a tax on the *Page 198 
master; or levy an impost upon imports by calling it a charge on the owner or super-cargo, and justify this evasion of a great principle by producing a dictionary or a dictum to prove that a ship captain is not a vessel, nor a super-cargo an import?" In the Nevada case the tax was levied in terms upon the passenger, so that no question was entertained by the court as to the construction of the Nevada statute. Lest, however, the judgment of the Court should be supposed to rest upon the directness of the statute, they say; (p. 39), "we should be very reluctant to admit that any form of words which had the effect "to compel every person traveling through the country "by the common and usual modes of conveyance, to pay a "specific sum to the State, was not a tax upon the right thus reserved."
We have in the Passenger Cases a construction given by the Supreme Court to a law of like structure with that before us. One of the statutes drawn into question in those cases was a health law of New York, by which the master of every vessel arriving in the port of New York from a foreign port, was required to pay to the health commissioner a certain sum for himself and for each passenger and by a subsequent section of the law a right was given to the master "to demand and recover from each person the sum paid on his account." In the opinions rendered in those cases, both by Judges of the majority and by those dissenting, this tax is treated as a tax on the passenger, the difference between the Judges being whether or not as such, it was a regulation of commerce in conflict with the commercial clause of the Constitution. This construction of the New York Act is especially observable in the opinions of Justice McLean, p. 404, Justice Wayne, p.
411, 412, 421, Justice Catron, p. 444, 448, and C. J. Taney, 483. The Chief Justice says of this law, "the tax is imposed on the passengers in this case clearly and distinctly; for although the captain who lands them is made liable for the collection, yet a right is expressly secured to him to recover it from the passenger." *Page 199 
Now, comparing the New York law with the act under consideration, it will be seen that they are in substance the same. In both the tax is to be raised by the same sort of operation, with two incidental differences only; these being rather the more stringent upon the passenger under our law. Under the New York law the master of the vessel was required first to pay the tax, with the right afterward to sue the passenger. While under our act the carrier is empowered to collect the tax before paying it over, and to collect it by means far more effectual than suit. This course of decisions indicates it as the settled judgment of the Supreme Court that statutes are to be construed, as well upon questions of constitutional power as for other purposes, according to their substance and effect, without regard to mere form or phraseology. Applying this test to the act before us, we consider that it taxes the passenger rather than the carrier, and under the rule of the Nevada case we must hold it to be inoperative and void, so far as it affects passengers entering into departing from, or passing through the State.